Argued and submitted July 31, affirmed October 15, 2003

# STATE OF OREGON,
## *Respondent,*

*v.*

# SHAWN LARRY REID,
## *Appellant.*

## 20-00-06202B; A115629

77 P3d 1134

Rankin Johnson IV, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was David E. Groom, Acting Executive Director, Office of Public Defense Services; and with him on the reply brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Paul L. Smith, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals from convictions for unlawful delivery of a controlled substance and unlawful possession of a controlled substance. ORS 475.992. Defendant asserts that the trial court erred in denying his motion to suppress evidence, specifically, 1.47 grams of crack cocaine found in his jacket during the execution of a search warrant at an apartment where he was an overnight guest. As described below, we conclude that, because the jacket was not in defendant's actual physical possession at the time that it was seized and searched, the search was lawful, as within the scope of the warrant, under the Fourth Amendment of the United States Constitution.[1] Accordingly, we affirm.

For purposes of our review, the material facts are undisputed. In March 2000, the Lane County Circuit Court issued a warrant authorizing the search of an apartment in Eugene, an automobile, and the persons of David Jefferson and James Allensworth, for evidence including firearms, cocaine, packaging materials, financial and travel records, and cash. Neither the warrant nor the supporting affidavit included any reference to defendant.

On March 21, at about 7:00 a.m., federal, state, and local law enforcement officers, including Oregon State Police Officer Rebecca Martin, executed the warrant at the apartment. Upon entry, police found defendant and defendant's sister, Grundy, asleep in the living room. Defendant was wearing a T-shirt and shorts. Defendant's belongings, including a jacket, were also in the living room. Jefferson was in another room in the apartment.

After presenting the warrant and reading *Miranda* rights to all three, Martin took Jefferson outside to interview him. Jefferson immediately exercised his right to an attorney, and the interview ended in less than five minutes.

---

[1] On appeal, defendant does not invoke, much less make any distinct argument under, Article I, section 9, of the Oregon Constitution. Given that posture, we imply no view as to the proper disposition under the Oregon Constitution. *See State v. Mendez*, 308 Or 9, 19, 774 P2d 1082 (1989) (Where the criminal defendant appellant "failed to brief or argue any independent state constitutional theory" on appeal, court addressed only the defendant's federal constitutional claim, and its "opinion decide[d] nothing under the Oregon Constitution.").

Martin then interviewed defendant. During the course of that interview, another officer, Rauch, told Martin that officers had found cocaine in a jacket located inside the apartment and that defendant had acknowledged ownership of the jacket. When Martin asked defendant about the cocaine, defendant admitted that it was his.

Defendant subsequently moved to suppress the cocaine found in the jacket. In addition to the facts just recited, testimony at the suppression hearing established that defendant was not wearing the jacket at the time that it was seized. However, the record does not disclose the jacket's exact physical proximity to defendant when it was seized. Nor does the record disclose when defendant told the police that the jacket was his. That is, it is impossible to determine from this record whether, at the time the police seized and searched the jacket, they knew that it was defendant's.

In moving to suppress, defendant referred to both the Fourth Amendment and Article I, section 9, of the Oregon Constitution. Defendant did not contest the validity of the warrant itself. Rather, defendant argued that, under *Ybarra v. Illinois*, 444 US 85, 100 S Ct 338, 62 L Ed 2d 238 (1979), the warrant did not authorize the search of defendant's person or of his belongings because he was merely a guest at the apartment. The state responded that the search of the jacket was not an impermissible search of defendant's "person" for purposes of *Ybarra* because defendant was not wearing the jacket and it was not in his actual physical possession at the time it was seized to be searched. Thus, the state reasoned, the search of the jacket was within the scope of the premises-wide warrant.

The trial court endorsed the state's position. The court found that the jacket was not in defendant's possession at the time that the warrant was executed and that, consequently, the search of the jacket was within the scope of the warrant. Defendant was subsequently convicted after a stipulated facts trial.

On appeal, as noted, *see* 190 Or App at 51 n 1, defendant does not mention the Oregon Constitution. Instead, he relies exclusively on Fourth Amendment authority. Defendant's position rests on the conjunction of two propositions:

(1) the state has the burden of proving that a search was within the scope of a warrant; and (2) the search of the jacket would be lawful, as within the scope of the warrant, only if the officers did not know that the jacket was defendant's before they seized and searched it. Defendant contends that, because the record does not disclose when the officers learned that the jacket was his, the state necessarily failed in its burden of proof.

■  Defendant is correct that the state bears the burden of demonstrating that the seizure or search of a contested item falls within the scope of a valid warrant. *See State v. Hall*, 166 Or App 348, 356-57, 999 P2d 509 (2000) (when a "defendant challenges [a] search as warrantless because there was no warrant *or because a search exceeded the scope of a warrant*, '[t]he burden to establish the lawfulness of a warrantless search and seizure is on the state' " (quoting *State v. Sargent*, 323 Or 455, 461, 918 P2d 819 (1996)) (footnote and citation omitted; emphasis added). However, for the reasons that follow, we disagree with defendant that, under the Fourth Amendment, the search of an item is beyond the scope of a premises-wide warrant if the police have actual knowledge that the item belongs to a visitor. Rather, the controlling test for Fourth Amendment purposes is one of actual physical possession. Because the jacket here was not in defendant's physical possession at the time that it was seized, the search was lawful as within the scope of the warrant.

■  In framing the dispute on appeal, the parties rely almost exclusively on two cases, *Ybarra* and *State v. Kurtz*, 46 Or App 617, 612 P2d 749, *rev den*, 289 Or 588 (1980). Neither is dispositive. In *Ybarra*, the Court held that, in the absence of probable cause, persons not named in a search warrant could not be searched merely because they were present on the premises at the time the warrant was executed.[2] *Ybarra* itself involved the patdown of a tavern patron

---

[2] As the court explained in *Ybarra*:

"[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.

"* * * * *

and did not address any extension of its reasoning to the personal effects of visitors to a premises.

We addressed that question—in part—the next year in *Kurtz*. In *Kurtz*, police officers executed a warrant to search a residence for cocaine and found the defendant, who was not named in the warrant, in the basement. The officers detained the defendant and took him upstairs and, in the ensuing search of the basement, found a daypack that contained cocaine. After the discovery of the cocaine, the officers determined that the pack belonged to the defendant. 46 Or App at 619. The defendant was consequently charged with possession of a controlled substance. The trial court denied the defendant's motion to suppress the evidence found in the daypack, and we affirmed.[3]

We first considered the defendant's contention that "officers executing a search warrant who have reason to think that guests are present with identifiable personal property should allow such guests to identify and claim property before the premises are searched." 46 Or App at 621. We rejected that proposition, noting that the trial court "found that the officers who found and searched the pack did not have actual knowledge that it belonged to defendant," and concluding that imposing such a "duty of inquiry" on officers executing a warrant would be impractical. *Id.* at 621-22.

We then turned to the defendant's alternative argument that, notwithstanding any "duty of inquiry," the search of the pack was beyond the scope of the warrant under an application of *Ybarra*'s reasoning to a visitor's personal effects. In that regard, the defendant relied on the so-called "relationship test" developed in *United States v. Micheli*, 487 F2d 429 (1st Cir 1973), a pre-*Ybarra* decision.

---

"Although the search warrant, issued upon probable cause, gave the officers authority to search the premises * * * it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers."

444 US at 91-92 (citation and footnote omitted).

[3] The validity of the search of the daypack was raised by a cross-appeal. *Kurtz*, 46 Or App at 621. The substance of the state's appeal in *Kurtz* is immaterial to our discussion.

In *Micheli*, the issue was whether a warrant to search a business premises authorized a search of a briefcase that officers had seen the defendant, a co-owner of the business, carry onto the premises immediately before the warrant was executed. The First Circuit, in sustaining the search, determined that the relationship between the defendant and the premises was such that the defendant could have reasonably expected that a search of the premises pursuant to a warrant would encompass a search of his personal effects.[4]

In *Kurtz*, we quoted the *Micheli* test, in part:

" 'It should not be assumed that whatever is found on the premises described in the warrant necessarily falls within the proper scope of the search; rather, it is necessary to examine why a person's belongings happen to be on the premises. "[T]he Fourth Amendment protects people, not places," *Katz v. United States*, 389 US 347, 352, 88 S Ct 507, 511, 19 L Ed 2d 576 (1967), and the protective boundary established by requiring a search warrant should encompass those extensions of a person which he reasonably seeks to preserve as private, regardless of where he may be.' "

*Kurtz*, 46 Or App at 622 (emphasis omitted) (quoting *Micheli*, 487 F2d at 432). We then rejected that test:

"We decline to adopt the suggested test in determining whether a search warrant allows search of visitors' belongings. If the search does not constitute a search of the person as proscribed under *Ybarra*, then the only issue is whether the scope of the search is 'reasonably necessary' to find those items specified in the warrant. ORS 133.585.

---

[4] The court explained:

"[A]s co-owner of the [business], appellant was not in the position of a mere visitor or passerby who suddenly found his belongings vulnerable to a search of the premises. He had a special relation to the place, which meant that it could reasonably be expected that some of his personal belongings would be there. Thus, the showing of probable cause and necessity which was required prior to the initial intrusion into his office reasonably comprehended within its scope those personal articles, such as his briefcase, which might be lying about the office."

*Micheli*, 487 F2d at 432.

"The trial court here determined that *the daypack was on the floor several feet from defendant when he was frisked.* At the time of the discovery of the pack and its search, defendant was upstairs, the pack downstairs, **and its ownership was not known to the officers at the time**. The warrant authorized search of the premises for cocaine and identification, and those things could have been concealed in the daypack. The search of the daypack was therefore within the scope of the warrant and valid."

*Id.* at 622-23 (footnote omitted; emphasis and boldface added).

As noted, both defendant and the state view *Kurtz* as being dispositive. Defendant points to the boldface language, as well as the court's earlier reference to the trial court's same finding ("the officers who found and searched the pack did not have actual knowledge that it belonged to defendant," 46 Or App at 621), as at least implicitly adopting an "actual notice" test—*i.e.*, that a premises-wide warrant does not authorize the search of an item if officers know that that item belongs to a nonresident or some other person not subject to the warrant. The state relies on the italicized language as, again at least implicitly, adopting a "physical possession" test—*i.e.*, that any item on the premises, which could plausibly contain or conceal articles described in the warrant, may be searched unless it is in the actual physical possession of a person not subject to the warrant.

With respect, we believe that neither party is correct—and that, in fact, *Kurtz* did not choose between the "actual notice" and "physical possession" tests. Certainly—and there are few certainties about *Kurtz*—the court was not required to make that choice because the trial court there was correct under either formulation.[5] Beyond that is ambiguity. The opinion's reference to "a search of the person as proscribed under *Ybarra*," 46 Or App at 623, begs the question of exactly what *Ybarra* proscribes. Moreover, if *Kurtz* rested solely on a "physical possession" rule, then its references to the officers' knowledge would seem superfluous—

---

[5] *Viz.*, the daypack was not in Kurtz's physical possession, *and* the officers were unaware that the pack was his at the time they seized and searched it.

*i.e.*, under the "physical possession" test, if the item was not in the defendant's physical possession, it would be immaterial whether the police knew whether it was his; so long as it was not in his physical possession and it could contain items named in the warrant, they could search it. On balance, the most reasonable reading of *Kurtz* is that it explicitly rejected *Micheli*'s pure "relationship" formulation but left open for future decisions whether "actual notice" or "physical possession" was the controlling test under the Fourth Amendment.

We must now decide that question. The same question has deeply divided courts in other jurisdictions since *Ybarra. See* Diane L. Schmauder, Annotation, *Propriety of Search of Nonoccupant Visitor's Belongings Pursuant to Warrant Issued for Another's Premises*, 51 ALR 5th 375 (1997); Wayne R. LaFave, 2 *Search and Seizure* § 4.10(b) (3d ed 1996). Those decisions are highly instructive.

The "actual notice" test evolved as a restrictive variation of the pure "relationship" test that originated in *Micheli* and *Commonwealth v. Platou*, 455 Pa 258, 312 A2d 29 (1973), *cert den*, 417 US 976 (1974), *overruled by Commonwealth v. Reese*, 520 Pa 29, 549 A2d 909 (1988), *cert den*, 497 US 1003 (1990). Unlike the *Micheli/Platou* pure "relationship" test, which turns solely on the defendant's relationship to the premises, *see* 190 Or App at 55 n 4, under the "actual notice" test, officers executing a premises-wide warrant may search all items that plausibly could contain articles described in the warrant unless the officers have actual knowledge that the item belongs to a nonresident. *See* LaFave, 2 *Search and Seizure* § 4.10(b) at 663-64. Putting aside for the moment certain definitional and pragmatic difficulties, courts employing that approach have concluded that it strikes the optimal balance between protection of privacy interests and effective law enforcement. Like the "relationship" test, the "actual notice" test presumes that a magistrate issuing a premises-wide warrant did not intend to authorize a search of the effects of "mere visitors" to the property; but unlike the "relationship" test—and, in an apparent effort to ameliorate the amorphous aspects of that test—it interjects the "objective" qualification of "actual notice."

In *People v. McCabe*, 144 Cal App 3d 827, 830, 192 Cal Rptr 635, 636-37 (1983), the court set out the classic formulation of the "actual notice" test, which subsequently was endorsed in other jurisdictions:

> "The police may ordinarily assume that all personal property which they find while executing a search warrant is the property of a resident of the premises subject to search. Thus, the police may search any personal property of a visitor which might serve as a plausible repository of the contraband which is the object of the search where they have no knowledge of the fact that the item searched is the personal property of a visitor. If the police have actual knowledge that the property which is searched belongs to a nonresident, however, they may not, as a general rule, rely on the authority conferred by a search warrant to conduct a warrantless search of the nonresident's property, even though it is a plausible repository of contraband. When the police know that the personal effects found on the property belong to a nonresident, the police may rely on the authority of the search warrant to conduct a search of the personal effects of the nonresident only if someone within the premises has had an opportunity to conceal contraband within the personal effects of the nonresident immediately prior to the execution of the search warrant."[6]

---

[6] The origins of the "actual notice" test antedated *McCabe*. In *State v. Nabarro*, 55 Haw 583, 525 P2d 573 (1974), a pre-*Ybarra* case, the court held that the search of a nonresident woman's purse was beyond the scope of a warrant authorizing the search of a motel room and naming two men as the occupants of the room to be searched. In so holding, the court first acknowledged the practical exigencies of executing a search warrant:

> "[P]olice cannot realistically be expected to avoid searching the property of a mere visitor to the premises unless they are aware of its ownership. Absent a requirement of such awareness, the effective execution of a warrant to search a place would be impossible since the police could never be sure that a plausible repository for items named in the warrant belongs to a resident, and hence is searchable, or to a non-resident, and hence is not searchable. Because of this, without notice of some sort of the ownership of a belonging, the police are entitled to assume that all objects within premises lawfully subject to search under a warrant are part of those premises for the purpose of executing the warrant."

55 Haw at 587-88, 525 P2d at 576-77. Nevertheless, the court concluded:

> "[T]here was no question that the police had notice, prior to the search, that [the defendant]—indisputably a non-resident visitor to the premises—was the owner of the purse. The warrant named two men as the occupants of the room to be searched, making it likely that any purses, which are characteristically female attire, found in the room belonged to non-residents."

*Id.* at 588, 525 P2d at 577 (emphasis deleted).

(Citations omitted.) *See also Houghton v. State*, 956 P2d 363 (Wyo 1998) (applying "actual notice" test to search of passenger's purse during course of vehicle search), *rev'd*, 526 US 295, 119 S Ct 1297, 143 L Ed 2d 408 (1999); *Waters v. State*, 924 P2d 437, 439 (Alaska App 1996) (search of nonresident's coin purse was lawful where executing officers did not "actually know," and circumstances would not "lead a reasonable officer to actually know," that purse belonged to "mere visitor"); *State v. Thomas*, 818 SW2d 350, 360 (Tenn Crim App 1991) (search of purse that officers "knew or should have known" belonged to nonresident was unlawful where there was no opportunity for anyone to have hidden cocaine in the purse); *State v. Lambert*, 238 Kan 444, 710 P2d 693 (1985) (search of purse found unlawful because police could not reasonably have believed that it belonged to man named in the warrant).

Practical application of the "actual notice" test is problematic. *See State v. Leiper*, 145 NH 233, 235, 761 A2d 458, 462 (2000) ("[T]he relationship/notice test is so nebulous it provides little guidance to police officers or trial courts."). For example, does its protection apply to all nonresidents or merely to "transient visitors"? Presumably because of the test's original roots in the *Micheli* pure "relationship" formulation, courts have given varying and inconsistent answers. *See State v. Andrews*, 201 Wis 2d 383, 402-03, 549 NW2d 210, 217-18 (1996) (noting, *e.g.*, inconsistencies in determining whether overnight guest was "mere visitor"); *State v. Jackson*, 873 P2d 1166, 1168 (Utah Ct App 1994) (under "relationship" test, executing officers would be "required to determine whether the owner of the item or container was merely a 'transient visitor' or whether there was some greater connection to the premises"). *Cf. Micheli*, 487 F2d at 434 (Campbell, J., concurring) ("Since the nature and quantum of 'relationship' cannot readily be defined, officers and courts may be bedevilled with uncertainty in a field where certainty is especially desirable. The 'test' may dissolve into a protracted hunt for guidelines so faint as to be unrecognizable.").

Further, is the operative standard one of actual knowledge, putative objectively reasonable knowledge, or something else? That is, must executing officers actually

"know" that an object belonged to a "visitor," or is it sufficient if an objectively reasonable officer should have known—and how, if at all, should notions of imputed or shared knowledge apply? *Compare McCabe*, 144 Cal App 3d at 830, 192 Cal Rptr at 636-37 ("actual knowledge"), *with Thomas*, 818 SW2d at 360 (dispositive inquiry was whether "officers executing the warrant knew or should have known" that overnight guest owned purse), *with Waters*, 924 P2d at 439 (executing officers must "actually know" or "existing circumstances would lead a reasonable officer to actually know" that article belonged to "mere visitor"; a "mere showing of grounds for suspicion—even a showing of grounds for strong suspicion or of probable cause to question ownership—will not suffice"), *with Nabarro*, 55 Haw at 588, 525 P2d at 577 (granting suppression because it was "likely that any purses, which are characteristically female attire, found in the room belonged to non-residents").

Perhaps most troubling from a pragmatic sense is the assessment of what type or source of information is adequate to establish "actual" (or sufficient constructive) "knowledge." If, in the course of a raid, a person not subject to the warrant proclaims that he or she is a mere visitor and claims ownership of a parcel or backpack, would that be sufficient to preclude a seizure and search of that item? *See Jackson*, 873 P2d at 1169 ("[A]n astute drug dealer could presumably keep a stable of transient visitors who, in the event of a search, will merely proclaim their status and then declare ownership in the contraband, thus placing the objects of the warrant beyond the scope of the search.").

In contrast to the "actual notice" test, the virtue of the "physical possession" test is its simplicity and ease of application. Its vice is the same bright-line, potentially arbitrary, simplicity and inflexibility.

■ Under the "physical possession" test, officers executing a warrant may search all items that could contain articles identified in the warrant except those that are in the actual physical possession of a person not subject to the warrant. *See, e.g., Leiper*, 145 NH at 234-36, 761 A2d at 460-62 (where the defendant was sitting on or near a couch and his knapsack was "near him on the couch," the knapsack was not

within the defendant's "physical possession" and, thus, was subject to search as within the scope of a premises-wide warrant); *Andrews*, 201 Wis 2d at 395, 549 NW2d at 214 (where officer stopped the defendant in a hallway leading from a bedroom, duffel bag that the defendant left in the bedroom was not in his "physical possession"); *Reese*, 520 Pa at 34-35, 549 A2d at 911-12 (jacket draped over a chair within a few feet of the defendant was not in the defendant's actual physical possession: "The jacket was not being worn by [the defendant] and therefore, cannot be characterized as an extension of his person so as to propel its search into a search of [the defendant's] person."); *Jackson*, 873 P2d at 1166-69 (where the defendant was standing in the kitchen and her purse was "lying on the kitchen counter," search of the purse was permissible because it was not in the defendant's "physical possession").[7]

The courts that have adopted the "physical possession" test have emphasized its simplicity and clarity. *See, e.g.*, *Leiper*, 145 NH at 235, 761 A2d at 462 ("physical possession" test "will minimize the potential for fraud and gamesmanship during the execution of search warrants when parties not named in the warrant are present at the location of a search"). Nevertheless, it is also subject to abuse. For example, at the most basic, mechanical level, individuals not subject to the warrant could conceal incriminating evidence "through the simple act of stuffing it in one's purse or pockets." *United States v. Young*, 909 F2d 442, 445 (11th Cir 1990), *cert den*, 502 US 825 (1991).

More fundamentally, under the "physical possession" test, the lawfulness of a search depends not on the nature of the object being searched but, instead, on the circumstantial fortuity of physical possession. Thus, a jacket cannot be searched if it is worn by a person not subject to the warrant, but the same jacket can be searched it if is thrown on the floor or hung in a closet. *See Micheli*, 487 F2d at 431 ("physical possession" rule "would leave vulnerable many personal effects, such as wallets, purses, cases, or overcoats,

---

[7] The "physical possession" test appears to have originated in a pre-*Ybarra* case, *United States v. Teller*, 397 F2d 494, 497 (7th Cir 1968), *cert den*, 393 US 937 (1968).

which are often set down upon chairs or counters, hung on racks, or checked for convenient storage"); *see also* LaFave, 2 *Search and Seizure* § 4.10(b) at 662 (endorsing criticism).[8]

Finally, in its most literal application, the "physical possession" test sanctions searches of property that could not possibly have been within the issuing magistrate's contemplation. *See Platou*, 455 Pa at 263, 312 A2d at 33 ("The police had no knowledge of the existence of appellant, or of his property, prior to the time they entered [the] apartment. *A fortiori*, neither did the issuing magistrate. The warrant therefore could not possibly have described appellant's effects."). Thus, hypothetically, if a Girl Scout were selling cookies at a drug house when the police execute a premises-wide warrant, and she placed her satchel, bearing her name and the Girl Scout logo on the floor, the police could lawfully search the satchel for evidence of drug dealing under an inflexible application of the "physical possession" rule.

We are, thus, faced with a choice between two competing Fourth Amendment tests. One is, at least in the abstract, more protective of privacy interests but presents considerable problems of practical application by law enforcement personnel and reviewing courts. The other test, while not entirely free of ambiguity, is much simpler to apply and review but, in some circumstances, is less protective of privacy interests. That choice is not easy, as our recounting of the division among other courts shows.

But, in fact, our function is not to "choose" between those tests. Rather, we must discern which of those approaches is more consonant with the evolving Fourth Amendment jurisprudence of the United States Supreme Court. In that regard—and unlike almost every other court that has considered this question—we have the benefit of the

---

[8] In *Micheli*, the court continued:

"The Fourth Amendment's basic interest in protecting privacy, and avoiding unreasonable governmental intrusions, is hardly furthered by making its applicability hinge upon whether the individual happens to be holding or wearing his personal belongings after he chances into a place where a search is underway. The rudest of governmental intrusions into someone's private domain may occur by way of a search of a personal belonging which has been entrusted to a nearby hook or shelf."

487 F2d at 431 (citations omitted).

Court's 1999 opinion in *Wyoming v. Houghton*. Although *Houghton* is not dispositive because it involved the search of a vehicle, the thrust and tone of the Court's analysis leaves little doubt that, if faced with the question, the Court would endorse a "physical possession" test for searches of premises.

In *Houghton*, Wyoming police made a routine traffic stop of a car, driven by a man, with two women passengers, one of whom was the defendant. An officer noticed a syringe in the driver's pocket and, when asked why he had the syringe, the driver responded that "he used it to take drugs." 526 US at 298. Officers ordered the two women passengers out of the car and began searching the car for contraband. In the back seat, an officer found a purse, which the defendant claimed was hers. The officer opened the purse and removed a wallet, which contained the defendant's driver's license. The officer then continued his search of the defendant's purse and discovered drug paraphernalia and a syringe containing methamphetamine. *Id.*

The defendant was convicted of possession of a controlled substance. The Wyoming Supreme Court reversed the conviction, holding that the search of the defendant's purse was unlawful. *Houghton v. State*, 956 P2d 363 (1998). In so holding, that court relied on the "actual notice" test. After discussing *Ybarra* and *United States v. Ross*, 456 US 798, 102 S Ct 2157, 72 L Ed 2d 572 (1982), the court canvassed the development and content of the "relationship" test, the "physical possession" test, and the "actual notice" test. *Houghton*, 956 P2d at 367-69. The Wyoming Supreme Court ultimately endorsed the "actual notice" test as "afford[ing] the best balance between the legitimate interests of both the individual and law enforcement":

> "The 'notice' test provides law enforcement officers clear guidelines, and can be quickly implemented in an emergency situation, but does not unnecessarily abrogate individualized Fourth Amendment protection merely because a jacket is removed or a purse is placed on a floor or table."

*Id.* at 369-70. Applying that test, the court concluded that the search of the defendant's purse was not within the scope of the automobile search because (1) the officer's probable cause pertained solely to the driver, and not to the defendant;

(2) the officer "knew or should have known" that the purse did not belong to the driver because it was a "lady's purse" and "men do not carry purses"; and (3) the officers had no reason to believe that contraband had been placed in the purse immediately before or during the stop. *Id.* at 370-71.

The Supreme Court reversed.[9] The Court first held that the search was lawful as within the scope of the automobile exception as described in *Ross* and related cases. *Houghton*, 526 US at 300-02.[10] Much more importantly, for our purposes, however, the Court then went on to state, and explain, that its holding—specifically including its rejection of the "actual notice" rule "is fully consistent with the balance of our Fourth Amendment jurisprudence." *Id.* at 302. In that regard, the Court emphasized the following salient propositions:

*First*, under the Fourth Amendment, " 'the critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.' " *Id.* at 302 (quoting *Zurcher v. Stanford Daily*, 436 US 547, 556, 98 S Ct 1970, 56 L Ed 2d 525 (1978)).

*Second*, such nonauto search cases as *Ybarra* and *United States v. Di Re*, 332 US 581, 68 S Ct 222, 92 L Ed 210 (1948), were distinguishable in that those cases involved "body searches" and "turned on the unique, significantly heightened protection afforded against searches of one's person." *Houghton*, 526 US at 303. In so characterizing *Ybarra* and *Di Re*, the Court referred favorably to *Terry*'s statement that " 'Even a limited search of the outer clothing * * * constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience,' " and concluded that "Such traumatic consequences are not to be expected

---

[9] Justice Scalia authored the opinion of the Court, in which five other justices, including Justice Breyer, joined. Justice Breyer also concurred, 526 US at 307-08, and Justices Stevens, Souter, and Ginsberg dissented, *id.* at 309-13.

[10] The majority acknowledged that "there was no passenger in *Ross*, and it was not claimed that the package in the trunk belonged to anyone other than the driver." 526 US at 301.

when the police examine an item of personal property found in a car." *Id.* (quoting *Terry v. Ohio,* 392 US 1, 24-25, 88 S Ct 1868, 20 L Ed 2d 889 (1968)) (footnote omitted).

Further, in responding to the dissent's criticism that it was coining a "newly minted" rule that was "based on a distinction between property contained in clothing worn by a passenger and property contained in a passenger's briefcase or purse," *Houghton,* 526 US at 309-10 (Stevens, J., dissenting), the majority asserted that there was nothing novel in its approach—and that, in fact, its analysis rested on a well-settled distinction "between search of the person and search of property." *Id.* at 303 n 1. In particular, the majority took issue with the dissent's characterization of Justice Jackson's opinion in *Di Re:*

> "Does the dissent really believe that Justice Jackson was saying that a house-search could not inspect *property* belonging to persons found in the house—say a large standing safe or violin case belonging to the owner's visiting godfather? Of course that is not what Justice Jackson meant at all. He was referring *precisely* to that 'distinction between property contained in clothing worn by a passenger and property contained in a passenger's briefcase or purse' that the dissent disparages * * *. This distinction between searches of the person and searches of property is assuredly *not* 'newly minted * * *.' And if the dissent thinks 'pockets' and 'clothing' do not count as part of the person, it must believe that the only searches of the person are strip searches."

*Houghton,* 526 US at 303 n 1 (emphasis in original).

*Third,* and finally, the Court emphasized the practical difficulties of employing the "actual notice" test:

> "[O]nce a 'passenger's property' exception to car searches became widely known, one would expect passenger-confederates to claim everything as their own. And one would anticipate a bog of litigation—in the form of both civil lawsuits and motions to suppress in criminal trials—involving such questions as whether the officer should have believed a passenger's claim of ownership, whether he should have inferred ownership from various objective factors, whether he had probable cause to believe that the passenger was a

confederate, or to believe that the driver might have intro-
duced the contraband into the package with or without the
passenger's knowledge. When balancing the competing
interests, our determinations of 'reasonableness' under the
Fourth Amendment must take account of these practical
realities. We think they militate in favor of the needs of law
enforcement, and against a personal-privacy interest that
is ordinarily weak."

*Id.* at 305-06 (footnote omitted). The Court particularly chal-
lenged the dissent's "confiden[ce] in a police officer's ability to
apply a rule requiring a warrant or individualized probable
cause to search belongings that are * * * obviously owned by
and in the custody of a passenger," *id.* at 311:

"Should it not be enough if the passenger *says* he owns
the briefcase, and the officer has no concrete reason to
believe otherwise? Or would the dissent consider *that* an
example of 'obvious' ownership? On reflection, it seems not
at all obvious precisely what constitutes obviousness—and
so even the dissent's on-the-cheap protection of passengers'
privacy interest in their property turns out to be unclear,
and hence unadministrable."

*Id.* at 306 n 2 (emphasis in original).

*Houghton* leaves little to the imagination. The Court
restrictively characterized the contours of "person" (as
opposed to a person's property) in *Ybarra* and *Di Re*; it dis-
paraged the "actual notice" test as "unadministrable"; and,
in "balancing" the personal privacy interests that it deemed
"ordinarily weak" against the "practical realities" of
law enforcement, the Court decisively favored the latter.
*Houghton*, 526 US at 306. There can be little, if any, question
after *Houghton* that "physical possession," and not "actual
notice," is the controlling Fourth Amendment test for
searches of property pursuant to premises-wide warrants.
*See Leiper*, 145 NH at 234-36, 761 A2d at 461-62 (post-
*Houghton* decision, adopting "physical possession" test for
execution of premises-wide warrants; noting that "simple
and practical requirements to protect constitutional rights
serve the sound administration of justice and benefit the
police, the courts, and the bar").

We thus conclude that, under the Fourth Amendment, the lawfulness of the seizure and search of defendant's jacket must be assessed under the "physical possession" test. The record establishes that, at the time the jacket was seized and searched, it was not in defendant's actual physical possession. Defendant was not wearing the jacket; instead, it, along with his other belongings, was physically separated from him. It is undisputed that the jacket was capable of containing items of the sort identified in the search warrant. Consequently, the state met its burden of demonstrating that the search of the jacket was within the scope of the warrant.

Affirmed.