Argued and submitted February 10, 2015, affirmed March 16, petition for
review denied June 30, 2016 (359 Or 847)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ERLENE KAY REGER,
*Defendant-Appellant.*

Malheur County Circuit Court
12034379C; A152883

372 P3d 26

Bear Wilner-Nugent argued the cause and filed the briefs
for appellant.

Paul L. Smith, Assistant Attorney General, argued the
cause for respondent. On the brief were Ellen F. Rosenblum,
Attorney General, Anna M. Joyce, Solicitor General, and
Michael R. Salvas, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and
Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Following a botched shooting in defendant's garage, a jury convicted defendant of attempted murder, ORS 161.405 and ORS 163.115; conspiracy to commit murder, ORS 161.450 and ORS 163.115; and assault in the second degree, ORS 163.175. On appeal, in two assignments of error, defendant challenges the trial court's denial of her motion for judgment of acquittal and her motion to suppress evidence. We affirm.

In reviewing the denial of a motion for judgment of acquittal, we draw all reasonable inferences in the light most favorable to the state to determine whether the record contains evidence from which a rational trier of fact could find the elements of the charged crime beyond a reasonable doubt. *State v. Hart*, 222 Or App 285, 288, 193 P3d 42 (2008). Accordingly, in the discussion that follows, we state the facts in the light most favorable to the state. *State v. Webb*, 262 Or App 1, 3, 324 P3d 522 (2014).

Defendant's husband, Earl Reger, shot and wounded the victim, the ex-husband of defendant's daughter, in the garage of the Regers' home. The state alleged that defendant was involved in the shooting by participating in a plot to murder the victim. The other conspirators were Earl and a family friend, Fritz.[1] The issues on appeal concern whether the state produced legally sufficient evidence of defendant's participation in the crimes and whether the state's warrant to search defendant's home was sufficiently particular.

The victim and defendant's daughter, C, had been married and had a baby son, R. After they divorced, C and R lived with defendant and Earl. Because C was enrolled in college courses, defendant and Earl were heavily involved in R's daily life. Under the divorce judgment, the victim was entitled to parenting time with R three mornings a week. On those mornings, the victim would pick R up at 10:00 a.m. and return him to the Regers' home at noon.

According to the state's theory, defendant and Earl hated the victim. They became convinced that he

---

[1] The role of a fourth conspirator, Mulvaine, was not material to defendant's convictions and is not relevant to the arguments on appeal.

was abusing R and violating parenting time rules. They reported those allegations to police and requested that the Department of Human Services (DHS) investigate the victim. On more than one occasion, defendant or Earl refused to cooperate with the victim when the victim arrived to pick up R. In January 2012, when the victim arrived to pick up his son, defendant refused, asserting that R was sick and that she was taking him to the doctor. The victim called police. When police informed defendant that she was in violation of the court's order regarding parenting time, defendant replied, "he can take a sick baby * * * I can't believe this. * * * I'll call the doctor's office and cancel his appointment and make it later because of the Oregon law." In a subsequent interview regarding the incident, defendant told police that the victim was a "monster" and that the judicial system was "an absolute joke" for allowing the victim to be with his son. Police relayed information regarding the incident to DHS, which, after some consideration, declined to investigate.

Approximately one month later, on February 29, 2012, the events occurred that led to defendant's arrest. Earl asked Fritz to help him murder the victim and dispose of the body. Earl acquired a gun and ammunition. On the morning of February 29, Earl picked up Fritz, and they arrived at the Regers' house by approximately 9:30 a.m. Earl had covered most of the exposed areas of the garage with plastic sheeting; Fritz helped him complete that task. Fritz would later testify that he had seen defendant cleaning the carpets "[j]ust before 10:00 [a.m.]."

The victim arrived at 10:00 a.m. to pick up R. As defendant handed over R, she told the victim that, when he returned, he should enter through the garage because she was going to shampoo the rugs by the front door. The victim testified at trial that, at the time of that conversation, he did not see any stains on the rugs.

At noon, the victim brought R home. As defendant had requested, the victim came through the garage, where Earl and Fritz were standing, and handed the baby to defendant through the doorway to the house. The victim turned to leave, and Earl, who had his arm wrapped in a sling,

mentioned that he had injured his hand. He asked the victim to help him pick up some wooden objects off the garage floor. When the victim bent down, Earl removed a gun from the sling and shot the victim in the back of the head. The shot failed to seriously injure the victim, who was able to flee, but not before Earl shot him a second time in the hip.

The victim made it to a highway and flagged down a police vehicle that delivered him to a hospital, where he received medical attention and gave a statement to police. Approximately one hour after the shooting, around 1:00 p.m., police arrived at the Regers' home and took both defendant and Earl into custody. Defendant told police that she was unaware of what had happened in the garage until after the fact. She denied seeing Earl after the victim returned R at noon. She said that she had shampooed the rugs because Earl spilled coffee on them. At trial, defendant's story changed. She testified that, after she received R from the victim in the doorway to the garage, she took R to the bathroom for a bath, when she heard Earl scream her name. When she found Earl, he told her that he loved her and said that, "if it was good enough for Christopher, it's good enough for me," which defendant understood to mean that Earl was considering suicide because Earl's son, Christopher, had committed suicide. Defendant's explanation at trial for thinking that Earl was considering suicide was that Earl was "depressed."

Fritz was interviewed by police later the same day. During that interview, Fritz initially denied knowing whether defendant was part of the plan to murder the victim or whether Earl had told anyone else about the plot. Fritz also told police that, after the shooting, Earl "was knocking on the door" to the house, and that Earl and defendant "were standing there talking."

Later that evening, police returned to the Regers' home with a warrant to search for, among other things, "fibers," "DNA evidence," "blood or blood spatter evidence," and "hair/trace evidence." In the course of the search, Officer Hunsucker examined the entryway rugs and the rug shampoo device. Police felt that they were all dry and took the rugs into evidence.

About one week later, police arrested Fritz and interviewed him a second time. Fritz offered further information about defendant's actions that conflicted with defendant's own account to police. According to Fritz, immediately after the shooting, defendant opened the door to the house, and Earl followed her inside, where Fritz heard him say, "it didn't work," that Earl was "going to put a bullet in [his] head," and that he was "fucked." Fritz told police that Earl was still holding the gun while talking with defendant. Fritz heard defendant reply, "no, don't," and "it can be fixed" or "we can work it out." Fritz told police that, upon hearing that exchange, Fritz believed that defendant "had to be in on this." Fritz also told police that he called defendant after the shooting to see if Earl had committed suicide and that defendant had hung up without speaking.

Defendant was charged with attempted murder, ORS 161.405 and ORS 163.115; conspiracy to commit murder, ORS 161.450 and ORS 163.115; assault in the second degree, ORS 163.175; and reckless endangerment of another person, ORS 163.195.

Before trial, defendant moved to suppress all evidence "of the smell of any rugs, the state of dryness of any rugs or wood laminate, and any evidence concerning whether the shampoo device found in [defendant's] home had been recently used" because they "were not specifically identified in the search warrant." She also contended that any plain-view exception to the warrant requirement was inapplicable because the police were aware of the incriminating nature of the carpets and rug shampooer when they sought approval of the warrant and, thus, the seizure of those items was illegal because their discovery "must be inadvertent."

At a hearing on defendant's motion, the state called Ontario Police Chief Alexander and Officer Esplin to testify regarding the seizure of the rugs. Alexander testified that, a little more than an hour after the shooting, he did not smell anything indicating that there was "freshly cleaned carpet" in the entryway of defendant's house. Alexander also testified that police had a warrant to search the entire residence for evidence, and that DNA, blood or blood spatter, hair, and trace evidence were the types of evidence that one

could expect to find on rugs. Esplin also testified regarding his investigation of the rugs and shampooer:

"I was advised that the rugs near the front door had been shampooed earlier. And I went in and I was looking at those rugs. Um, I felt them, they didn't—I didn't detect any moisture in rugs or the pad underneath the rugs. The shampooer was sitting near the front door by the rugs and I also examined it. It didn't appear to have any moisture * * * inside. * * * I felt up inside the—where the brushes are, up inside the unit head itself, and didn't feel any moisture inside of that either."

Esplin, too, confirmed that "all kinds of very small items like fiber and trace evidence" could be found on the carpets and inside the rug shampooer and that their evidentiary value was "readily apparent." Defendant disagreed that the search warrant's reference to "DNA evidence or trace evidence or fiber evidence" was sufficient to encompass the items at issue. Defendant also argued that the plain view exception to the warrant requirement was inapplicable because police failed to mention the rug evidence in the warrant application despite knowing about the potentially incriminating nature of that evidence at the time.

The court denied defendant's motion to suppress, reasoning that the search warrant gave police the authority to search the entire home for, among other things, fibers, blood, hair, and other DNA evidence, which in turn justified the search and seizure of the rugs and shampoo device.

At trial, the state presented testimony from the victim describing defendant's comments about cleaning the rugs and her instruction that the victim should enter through the garage when he brought R home. The state also introduced evidence that police had inspected the rugs and shampooer and observed no indication of recent cleaning.

The state introduced the evidence of Fritz's statements during his police interviews, including his description and interpretation of the conversation between Earl and defendant in the garage immediately after the shooting. In his trial testimony, Fritz attempted to backtrack from some of those statements, claiming that he had "lied" because he "was scared" and because police "wanted answers."

In addition, the state presented evidence of defendant's animosity toward the victim and highlighted the discrepancies between defendant's trial testimony and what she said in her first police interview. For example, as noted above, in her initial interview on the day of the shooting, defendant denied seeing Earl after the shooting; at trial, defendant described being in the bathroom with the baby when Earl screamed and then threatened suicide.

The state also presented evidence of defendant's behavior following the shooting. About 40 minutes after the shooting, defendant sent messages on social media congratulating a friend on a new baby. A few minutes after that, defendant texted her daughter that "[w]e are vacuuming" because "Dad spilled coffee on my front rug, [it's] already shampooed." Defendant made no mention of the shooting in her garage or Earl's suicide threat.

Defendant moved for a judgment of acquittal on all counts. The trial court granted that motion as to the reckless endangerment charge, which is not a subject of this appeal. As to the remaining charges, defendant argued as follows:

> "The only evidence the state has would have to do with what [defendant] did at the door * * * [which] is insufficient evidence that she was in any kind of agreement. * * *
>
> "* * * * *
>
> "* * * [T]he only evidence about what happened at that moment comes out of the mouth of [Fritz]. [Fritz] is, by law, * * * a co-conspirator and by law an accomplice, and by law it is somebody that the trier of fact has to view his testimony with distrust. And if you look at what he said, as far as what happened at that door, he gave an unbelievable amount of inconsistent statements about what happened there. * * * Nobody can find * * * beyond a reasonable doubt * * * that [defendant] at all agreed with this conspiracy."

The state replied that conspiracies are "generally proven by the conduct of the parties," and that the evidence was sufficient to show that defendant, "along with Earl, acted together to lure [the victim] into the death chamber where he was shot."

The trial court denied the motion, explaining:

"Testimony was given from [the victim] that he didn't see any coffee stains or any stains on the rugs when he picked up the child. Now [defendant] asked him to go through the garage door when he came back.

"* * * I think the rugs [are] a key part for showing [defendant's] involvement that a juror could find. I'm not saying that they will, but they could. * * *

"[Fritz] said that [defendant] was cleaning the carpeting a little before 10:00 AM before the victim showed up. * * *[He] knew that [the victim] would go into the garage because [defendant] was cleaning the carpeting * * *. He told us that he made up stuff concerning [defendant]. He said that Earl told him * * * that he had poured coffee on the rugs intentionally. Earl knew his wife would tell the [victim] to go through the garage * * * knowing * * * that she was OC[D] on her home. That about Earl telling that he poured the coffee came on direct questioning from [defendant's attorney]. Then in re-direct he stated, when [the victim] got there [defendant] was already shampooing the carpeting, she was just starting to * * *. The carpets would have been cleaned by 10:00 AM because she's a very clean person.

"[Officer] Hunsucker testified that he helped with the search of the residence on February 29th. He saw the throw rugs. He identified them. He looked to see if the carpet cleaner had been used; he reached up to feel if the brushes were wet and see if there was any water. The containers were not attached and the carpet cleaner brushes were dry.

"* * * * *

"There was also an exhibit given * * * of text messages. * * * And at * * * the later time, [defendant] mentioned that she was shampooing the carpets and the grandchild was having fun. That is much different than what [the victim] had said, but I think that that gap and that behavior even started after what her husband told her could create within a juror a belief and an understanding beyond a reasonable * * * that reasonable element of being involved in the crime beyond a reasonable doubt could be found. And so I'm denying the motion for judgment of acquittal on that. I do find that a reasonable trier of fact could find that she was involved in a conspiracy from those elements[,] just those elements alone."

The jury convicted defendant of attempted murder, conspiracy to commit murder, and second-degree assault.

On appeal, defendant argues that the trial court erred in denying her motion for judgment of acquittal because the evidence was insufficient to prove that defendant "intended for [the victim] to be killed or injured." The thrust of defendant's argument is that the state's evidence consisted heavily or exclusively of the uncorroborated testimony of a co-conspirator, Fritz. Defendant cites the general rule that a defendant "may not be convicted on uncorroborated accomplice testimony" under ORS 136.440.

The state responds that, at trial, it presented sufficient evidence corroborating Fritz's testimony. We agree; defendant's arguments on appeal fail to grapple adequately with the other evidence on which the state relied at trial. That is, because other evidence in the record "fairly and legitimately tend[ed] to connect" defendant "with the commission of the crime," her conviction is "not based entirely" on the evidence from Fritz. *State v. Torres*, 207 Or App 355, 359-60, 142 P3d 99 (2006) (quoting *State v. Norton*, 157 Or App 606, 609-10, 972 P2d 1198 (1998)).

The other evidence includes the victim's testimony regarding defendant's actions (including the instruction to return through the garage), defendant's inconsistent accounts of the events on the day of the shooting, defendant's oddly mundane communications to her daughter and friends less than an hour after a shooting at her home following her husband's alleged suicide threat, and the police observations that the rugs and shampoo machine were dry mere hours after defendant purported to have been cleaning. The totality of that evidence is sufficient to corroborate Fritz's testimony.

Furthermore, to the extent that defendant is arguing that she was entitled to a judgment of acquittal, generally speaking, because the state did not proffer evidence sufficient to establish each element of the charged crimes, we reject that argument, as well. The same evidence that corroborates Fritz's testimony also is sufficient to allow a trier of fact to conclude that defendant participated in a plot to lure the victim into the garage under false pretenses,

where he would then be murdered. That is, the evidence was sufficient to establish the elements of the charged crimes beyond a reasonable doubt, and the trial court did not err by denying defendant's motion for judgment of acquittal.

We turn next to defendant's argument that the trial court erred in denying her motion to suppress evidence of the rugs and shampooer found at her home. In reviewing the denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record. *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). On appeal, defendant argues that the search warrant failed to specify those items and was therefore insufficiently particular. The state reprises its argument that the warrant authorized police to search the home for "fibers," "DNA evidence," "blood or blood spatter evidence," and "hair/trace evidence," which was sufficient to encompass the rugs and shampooer.

Article I, section 9, of the Oregon Constitution provides that no search warrant "shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." The state bears the burden of demonstrating that the seizure or search of contested evidence falls within the scope of a valid warrant. *State v. Reid*, 190 Or App 49, 53, 77 P3d 1134 (2003). ORS 133.565(2)(c) requires that a search warrant, among other things, must state, or describe with particularity "[t]he things constituting the object of the search and authorized to be seized[.]" In order to issue a search warrant, a judge must conclude that, "on the basis of the record before him [or her], there is probable cause to believe that the search will discover things specified in the application and subject to seizure." *State v. Anspach*, 298 Or 375, 380, 692 P2d 602 (1984) (internal quotation marks and citation omitted).

The purpose behind the particularity requirement "'is a prohibition against general warrants whereby administrative officers determine what is and what is not to be seized[,] *** to guide the officer to the thing intended to be seized and to minimize the danger of unwarranted invasion of privacy by unauthorized seizures.'" *State v. Rose*, 264 Or

App 95, 106-07, 330 P3d 680, *rev den*, 356 Or 400 (2014) (quoting *State v. Tidyman*, 30 Or App 537, 542-43, 568 P2d 666, *rev den*, 280 Or 683 (1977)). Furthermore, the "objective" of the particularity requirement is that "the search be as precise as the circumstances allow and that undue rummaging be avoided." *State v. Massey*, 40 Or App 211, 214, 594 P2d 1274, *rev den*, 289 Or 409 (1979). The "degree of specificity" required to achieve that objective "depends on the circumstances and the nature of the property to be seized." *Rose*, 264 Or App at 107.

*Rose* illustrates that a warrant can be broad and still sufficiently particular. In *Rose*, the defendant was convicted of using a child in a display of sexually explicit conduct after police, pursuant to a search warrant, obtained two emails containing photographs of the 16-year-old victim's bare breasts. 264 Or App at 97. The emails were obtained via the defendant's email account after police developed probable cause "to believe that the victim had sent photographs of her breasts to defendant through e-mail." *Id*. at 98. The warrant authorized police to search "[a]ny and all contents of electronic files" stored on a specific email account owned by the defendant. *Id*. at 107 (brackets in original). The defendant challenged the validity of the warrant on the ground that it was "insufficiently particular" because the warrant "did not limit the search by any time period or subject matter, such as a search for photographs of bare breasts." *Id*. at 106-07. We rejected the defendant's argument and concluded that, under those circumstances, the warrant was sufficiently particular because it "stated that the police could search for, and seize, evidence of the crimes of using a child in a display of sexually explicit conduct and encouraging child sexual abuse located in the electronic files stored in defendant's [email] account[.]" *Id*. at 109. As a result, "the warrant was limited to a particular location, and the description of the items to be seized left the officers with no discretion in the matter." *Id*.

Here, we conclude that the search warrant was sufficiently particular. It was reasonable to infer that the rugs and shampooer could have been a source of the types of evidence listed in the warrant. The warrant stated that the police could search a particular place—defendant's

home—for specific kinds of evidence—fibers, DNA, blood or blood splatter, hair, and other trace evidence—in connection with the officers' probable cause to believe that defendant committed first-degree assault, attempted murder, and conspiracy to commit those crimes. Thus, as we concluded in *Rose*, because the warrant limited police to search for particular types of evidence at a particular location in connection with a specific set of alleged crimes, it was sufficiently particular. *See Rose*, 264 Or App at 109. The warrant did not provide police with carte blanche to begin "rummaging" through defendant's home for anything but those kinds of evidence in connection to specific charges. *See Massey*, 40 Or App at 214. For those reasons, we conclude that the warrant was sufficiently particular to authorize the seizure of the carpets and the shampooer.[2]

Affirmed.

---

[2] Because we affirm the trial court's ruling on the ground that the search warrant was sufficiently particular, we need not separately consider the state's alternative justification that the search and seizure of the rugs and shampooer was permissible under the "plain view" doctrine. We do note, however, that defendant's argument against the applicability of that exception is based on an outdated rule that, in order for the plain-view exception to apply, the discovery of the evidence must be "inadvertent." *See State v. Handran*, 97 Or App 546, 550, 777 P2d 981 (1989), *overruled by State v. Peterson*, 114 Or App 126, 834 P2d 488 (1992), *abrogated by Horton v. California*, 496 US 128, 110 S Ct 2301, 110 L Ed 2d 112 (1990). That rule is no longer good law. *See Peterson*, 114 Or App at 130 ("[W]e overrule *Handran* to the extent that it makes inadvertence a necessary component of a plain view seizure in a warrantless search."). Moreover, the Oregon legislature repealed ORS 133.585—the inadvertent-discovery statute—in 1997. *See former* ORS 133.585 (1973), *repealed by* Or Laws 1997, ch 313, § 37 (1997).