Argued and submitted March 10, reversed and remanded  May 6, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARCUS JAMAL WILLIAMS,
aka Marcus Jomal Williams,
*Defendant-Appellant.*

Multnomah County Circuit Court
130130151; A154948

349 P3d 616

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

James M. Aaron, Assisant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jeff J. Payne, Assisant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

**GARRETT, J.**

After a stipulated facts trial, defendant was convicted of one count of felon in possession of a firearm, ORS 166.270(1), and one count of unlawful possession of cocaine, ORS 475.884. The issue on appeal is whether the trial court erred in denying defendant's motion to suppress evidence. Defendant argues that the warrant that police obtained to search his vehicle was not supported by probable cause, because police lacked a sufficient basis to believe that the vehicle would contain any evidence of a crime. For the reasons that follow, we agree with defendant and reverse.

On appeal, we consider only those facts that can be drawn from within the four corners of the affidavit in support of the search warrant. *State v. Sagner*, 12 Or App 459, 469, 506 P2d 510 (1973) (holding that "matters which were in the officers' knowledge but were not put before the magistrate" can play no role in our probable cause determination). In this case, Detective Goodwin of the Portland Police Bureau prepared the search warrant application. According to Goodwin's affidavit, on the afternoon of April 21, 2011, she and other officers responded to a shooting at the intersection of N. Williams Avenue and N. Fremont Street. Goodwin saw bullet casings and spent bullets on the sidewalk and in the street. She also saw a bullet hole in the windshield of a TriMet bus parked northbound on N. Williams. Three 9mm shell casings were recovered at the scene. South of the 9mm casings, police also found .40 caliber shell casings. Those casings were "found in close proximity to the sidewalk with a group of blood spots."

Goodwin interviewed an eyewitness who reported that he had seen a "cream colored older Toyota style vehicle" drive north on N. Williams. A passenger in that vehicle leaned out of the back seat and fired a gun toward the south, in the direction of a group of black males standing on the sidewalk. The eyewitness saw one person in the group step into the street and return fire at the vehicle. The eyewitness described that shooter as a "dark complected black male, approximately 5'7" to 5'9", approximately twenty one years of age, with a 'round face' and light facial hair, and he was firing a 'good sized' dark colored, semi-automatic handgun."

A TriMet bus driver told Goodwin that he had been driving north on N. Williams. When he approached the Fremont intersection, he heard gunfire and a bullet hit the windshield of the bus. The driver brought the bus to a stop and saw a group of black males standing on the sidewalk north of the intersection.

Goodwin's affidavit described several interviews that Portland police officers conducted later in the day with two men, defendant and Riley, at Emanuel Hospital. Riley had checked himself into the hospital with a gunshot injury to his wrist. Riley told Detective Grandwahl that unidentified persons in a passing car had shot at him while he was standing with his cousin and his brother on the sidewalk on N. Williams.[1] Riley said that no member of his group had had a gun, and that defendant had driven Riley to the hospital. Officer Hubert told Goodwin that he knew Riley to be a member of the "Unthank Park Hustlers Gang." The affidavit, however, does not identify defendant as a member of the group on the sidewalk, or even as being present at the time of the shooting.

Officer Polas spoke with defendant at the hospital. According to Goodwin's affidavit, defendant told Polas that defendant had driven Riley to the hospital in defendant's car. Defendant described his car, a Buick, and told Polas where it was parked in the hospital garage. Officer Pelster located the car and, through the window, saw blood on the passenger door armrest.

Grandwahl asked defendant for consent to search the vehicle, and defendant refused; Grandwahl then told defendant that police would apply for a warrant. According to Grandwahl, defendant "suddenly became nervous, had difficulty speaking clearly, and visibly was shaking as he pulled his cell phone." Defendant then asked Grandwahl whether he was free to leave.

Goodwin checked police records and learned that defendant was the registered owner of the Buick; she also learned that defendant's date of birth was November 5,

---

[1] It is unclear whether Riley meant that he was standing in a group that consisted of only his cousin and his brother, or that others were present as well.

1973, and that he was listed at 5'10" and 155 pounds. He had prior felony drug arrests in 2006 and 2002. Riley was listed as 5'9", 200 pounds, with a birth date of February 26, 1982.

In the remainder of her affidavit, Goodwin described her training and experience. Specifically, she averred:

> "I know through training and experience that people involved in the unlawful use of firearms often use vehicles to conceal and/or transport their firearms and firearms components * * *. Very often, the vehicles used are not registered to the persons who actually own or control them. * * *

> "I know that many times possessors of firearms will hide firearms in or outside the interior of the car to prevent law enforcement from finding them.

> "* * * * *

> "[P]ersons involved in shooting offenses who flee in vehicles in haste often times leave items of evidence to include, clothing, firearms, firearm accessories, cell phones, items of identification, documents, electronic devices that can be used to identify the possessors of firearms, and trace evidence inside the vehicles."

Goodwin's affidavit concluded that she believed there was probable cause to search defendant's Buick for evidence related to the crimes of unlawful use of a weapon, second-degree assault, first-degree criminal mischief, and felon in possession of a firearm.

The search warrant was issued and executed. Police found a .22 caliber handgun in the Buick. Defendant admitted that the .22 belonged to him, and said he used the gun for target practice. Defendant was indicted, but not arrested until late 2012. At the time of his arrest, he had cocaine in his possession. Defendant was charged with one count of felon in possession of a firearm and one count of unlawful possession of cocaine. Before trial, defendant moved to suppress the evidence resulting from the execution of the search warrant, arguing that the warrant was not supported by probable cause. The trial court called this a "close case" but denied the motion. Following a stipulated facts trial,

defendant was convicted of both the felon-in-possession count and the drug count. On appeal, defendant challenges the denial of his motion to suppress and reprises his arguments to the trial court.

When evaluating the sufficiency of a search warrant affidavit, our task is to determine "whether the affidavit alleged sufficient facts to permit a neutral and detached magistrate to determine that seizable evidence probably would be found at the place to be searched." *State v. Castilleja,* 345 Or 255, 269, 192 P3d 1283, *adh'd to on recons,* 345 Or 473, 198 P3d 937 (2008). That standard requires an affidavit to do more than allege facts that support a mere suspicion that evidence will be found; even a "well-warranted suspicion does not suffice." *State v. Tropeano,* 238 Or App 16, 18-19, 241 P3d 1184 (2010), *rev den,* 349 Or 654 (2011). Rather, the standard of probability requires the conclusion that "it is more likely than not that the objects of the search will be found at the specified location." *State v. Castro,* 194 Or App 109, 115, 93 P3d 815 (2004) (emphasis omitted).

The state argues that the affidavit is sufficient because it establishes a connection between defendant's car and the shooting that is strong enough to allow a neutral and detached magistrate to conclude that, more likely than not, evidence related to the shooting would be found in defendant's car.[2] That connection, according to the state, is established by five key facts: (1) Riley was "indisputably connected to" the shooting; (2) Riley was taken to the hospital in defendant's vehicle; (3) defendant appeared to be nervous when questioned by police; (4) although someone on the sidewalk returned fire at the northbound car, Riley denied that he or anyone else in his group had had a gun; (5) Goodwin's training and experience told her that people "involved in the unlawful use of firearms" often leave firearms or other evidence in vehicles. Those facts, however, were insufficient to establish a probability, as opposed to a mere possibility, that evidence would be found in defendant's vehicle.

---

[2] According to her affidavit, Goodwin believed that it was probable that the car contained evidence of four crimes: unlawful use of a weapon, ORS 166.220, second-degree assault, ORS 163.175, first-degree criminal mischief, ORS 164.365, and felon in possession of a firearm, ORS 166.270. All those crimes arose out of the same incident, the April 21 shooting.

The state needs to demonstrate a probability that *someone* caused evidence of the shooting to be placed in defendant's vehicle. The possible candidates are defendant, Riley, or an unknown third person. Goodwin's affidavit does not establish probable cause as to either defendant or Riley. At most, the affidavit established that Riley was a member of a group that was fired on from a moving vehicle, that a bullet struck Riley in his wrist, that an unidentified person on the sidewalk fired back, and that defendant drove Riley to the hospital in defendant's car. The affidavit does not identify Riley as the person who returned fire at the northbound vehicle. Furthermore, although Riley said that he was "with his cousin and his brother[,]" the affidavit states only that a "group" of unknown size was present on the sidewalk. That leaves open the possibility that people in addition to Riley and his relatives were present, expanding the universe of possible shooters.

Defendant's connection to the shooting is even more attenuated. Defendant is not identified as being the sidewalk shooter (in fact, he is identified as being 38 years old, while the eyewitness described the shooter as being about 21). Defendant is not even identified as being among the group standing on the sidewalk. Defendant's car is not identified as having been in proximity to the shooting when it happened. As far as one can tell from the affidavit, it is equally possible that defendant was nearby, arrived after the shooting, and drove Riley away. In sum, although Goodwin described Riley and defendant as being involved in the crime and relied upon her training and experience to aver that people involved in firearm crimes sometimes leave evidence in cars, all that the facts establish is that Riley was a shooting *victim* and that defendant came to Riley's aid. That does not give rise to a reasonable probability that either man *committed* a crime or possessed a firearm, let alone placed evidence of a firearm crime in defendant's vehicle.[3]

---

[3] The fact that defendant appeared to be nervous in response to an officer's questioning does not change the analysis. *See State v. Berry*, 232 Or App 612, 618, 222 P3d 758 (2009), *rev dismissed*, 348 Or 71 (2010) ("[T]here is nothing inherently suspicious about * * * being nervous when pulled over by a police officer[.]"). Goodwin's affidavit indicates that defendant was initially willing to answer police questions, but then became "suddenly nervous" when a detective indicated that police would be seeking a search warrant for his Buick. One possible explanation,

The state argues that the issue is not whether the affidavit adequately links Riley or defendant to the crimes, but whether it adequately links *defendant's car* to the crimes. The state reasons that "[e]stablishing the link between defendant's car and the evidence sought is not dependent upon whether defendant was a gang member or that he or Riley was the actual shooter." We understand the state's theory to be that evidence could have been placed in the car by an unknown third person also "connected" to the shooting who wished to "conceal and/or transport" his weapon. To the extent that Goodwin's affidavit urged such an inference, it is speculative. No reason is suggested why someone would have found it convenient to stash a firearm in defendant's vehicle on this occasion. Absent such a reason, the abstract assertion that people involved in firearm crimes often place evidence in vehicles is insufficient to show a *probability* that someone placed evidence in a car that had no connection to the crime other than the fact that it was used to transport a shooting victim.

In conclusion, although the circumstances described in the Goodwin affidavit may have contributed to a suspicion— even a "well-warranted suspicion," *Tropeano*, 238 Or App at 19—that evidence could be found in defendant's vehicle, the facts in the affidavit do not establish a probability that that was so. Consequently, the affidavit is legally insufficient to establish the probability necessary to support the issuance of a warrant to search defendant's Buick. Because the search warrant was not supported by probable cause, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

and the one that the state urges, is that defendant became nervous because he knew that there was incriminating evidence in his car. It is just as likely, however, that defendant became nervous because he inferred from the officer's statements that police suspected him of criminal activity.