72 November 6, 2024 No. 800

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTHONY LENAIRE CURRY,
aka Anthony L. Curry, aka Levone M. Donavon,
aka Michael Lavone Donovan, aka Tony Jackson,
*Defendant-Appellant.*

Multnomah County Circuit Court
14CR25418; A172629

Thomas M. Ryan, Judge.

Argued and submitted April 11, 2022.

Emily P. Seltzer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Anthony L. Curry filed the supplemental briefs *pro se*.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Powers, Presiding Judge, Lagesen, Chief Judge, and Hellman, Judge.

HELLMAN, J.

Reversed and remanded.

**HELLMAN, J.**

Defendant appeals from a judgment convicting him of multiple sex offenses against a minor victim, G. He raises eight assignments of error in his opening brief and seven additional assignments of error in his *pro se* supplemental brief. Defendant's first assignment of error challenges the trial court's denial of his motion to suppress evidence obtained from a warranted search of his residence in 2014. We conclude that four of the challenged search categories are insufficiently particular. Because the remedy framework that the Supreme Court established in *State v. Turay*, 371 Or 128, 532 P3d 57 (2023), applies to all search warrants, we remand to the trial court to apply that framework in this case.

We additionally conclude that the trial court did not err on any of the grounds raised in defendant's first, second, fourth, and fifth *pro se* assignments of error. Finally, in light of our disposition, we do not address defendant's other assignments of error because they depend on a record that is likely to develop differently on remand. *State v. Savage*, 305 Or App 339, 342, 470 P3d 387 (2020) ("Ordinarily, we will consider issues likely to arise on remand when the trial court or agency has determined a question of law that will still be at issue after the case is remanded.").

## I.  THE CHARGES AND PROCEDURAL BACKGROUND

The charges against defendant followed an investigation by Beaverton Police Detective Opitz in late August 2014 after a strip club employee reached out to police with suspicions that G was working at the club as a dancer under false identification. After confirming that G was 15 years old, police stopped defendant's car while he was transporting G and arrested him. G told Opitz that defendant had engaged in sexual contact with her multiple times. In September 2014, Opitz obtained and executed a warrant to search defendant's residence.[1]

---

[1] The search warrant was issued by a Washington County circuit court for offenses that defendant committed against G in Washington County. Those offenses were similar in nature and during the same timeframe as the Multnomah County offenses for which defendant was tried and convicted in this case.

In early October 2014, G went to CARES Northwest for a forensic exam and interview, where she made additional disclosures. A few days after the forensic exam, Opitz obtained a warrant to seize and search defendant's cell phone, which police had seized incident to his arrest just over one month earlier. Both searches uncovered evidence of criminal activity that, along with G's statements to law enforcement, led to the Multnomah County indictment on 34 counts, which were based on sex acts he committed against G, advertising G and initiating her into prostitution, and initiating and making money off of her dancing at strip clubs. In 2018, in response to a motion to suppress evidence discovered during the 2014 warranted searches of his residence and cell phone, the state obtained and executed another warrant to search defendant's cell phone.

A jury convicted defendant in January 2019 of multiple offenses.[2] This appeal followed.

## II.  FIRST ASSIGNMENT OF ERROR: MOTION TO SUPPRESS EVIDENCE FROM WARRANTED RESIDENTIAL SEARCH

Defendant asserts that the trial court erred in denying his motion to suppress evidence obtained from the warranted search of his residence in September 2014. He argues that the warrant was not sufficiently particular under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution, and that the trial court's error in denying the motion to suppress prejudiced him.

### A.  *Standard of Review*

"We review particularity challenges, as relevant to the denial of a motion to suppress evidence found in a warranted search, for legal error." *State v. Vesa*, 324 Or App 674, 680, 527 P3d 786 (2023) (citing *State v. Paye*, 310 Or App 408, 413, 486 P3d 808 (2021)).

---

[2] Defendant was convicted of one count of compelling prostitution, ORS 167.017; two counts of using a child in a display of sexually explicit conduct, ORS 163.670; four counts of attempt to commit using a child in a display of sexually explicit conduct, ORS 161.405(2)(b); eight counts of third-degree rape, ORS 163.355; seven counts of third-degree sodomy, ORS 163.385; and one count of attempt to commit promoting prostitution, ORS 161.405(2)(d).

B.  *Factual Background*

"In reviewing whether a search warrant was supported by probable cause, we consider only those facts put before the magistrate in the supporting affidavit, along with reasonable inferences that can be drawn from them." *State v. Cannon*, 299 Or App 616, 618, 450 P3d 567 (2019). We recite the facts accordingly.

Opitz submitted the search warrant for defendant's residence in September 2014. In the affidavit, Opitz discussed his experience and training, as well as his knowledge about sex crimes, cell phones and computers, and then described the investigation in detail, as follows.

Opitz started investigating G's circumstances in late August 2014 after a manager at a strip club reached out with suspicions that G was working at the club using false identification. The manager informed Opitz that G had danced, fully nude, an estimated five days at the club. Opitz then confirmed that the identification was fake and conducted a records check on G. He learned that she had been reported missing in July 2014, after running away from a substance abuse treatment center.

Opitz's investigation led him to more strip clubs in Washington County and Multnomah County where G had danced fully nude. A bartender at one of the strip clubs informed him that on one occasion within the past month:

"[A] black male subject came into [the strip club] and [G] told [the bartender] this unidentified black male was holding onto her money and she was trying to get away from him but couldn't. [G] told [the bartender] that she did not like the way that the black male subject was treating her and mentioned that she ([G]) was working for him."

In addition, Opitz conducted a Google search of G's cell phone number and found evidence that G was the victim of sex trafficking. Opitz listed four prostitution advertisements connected with G's phone number and explained that each advertisement included multiple photographs, although none of them showed the subject's face.

In early September 2014, police conducted a traffic stop of defendant in the parking lot of a strip club where G was scheduled to work after observing G in his vehicle. Police arrested defendant and spoke with G, who informed Opitz that she was there to dance at the club. She had the fake identification and a pre-paid cell phone in her purse. G consented for Opitz to search the phone, and he located a phone contact entry for defendant.

During an interview, G provided Opitz with the following information regarding "her relationship with [defendant]." G met defendant in the downtown Portland area in early July 2014. G originally told defendant that she was 17 years old. A few days later, she told defendant that she was 15 years old and that she had run away from a substance abuse treatment center just before meeting him. After learning G's actual age, defendant helped G get a fake Oregon identification card purporting that she was 21 years old.

G informed Opitz that defendant had used his cell phone to take sexually explicit photographs of G while she was in defendant's home and had posted those photos in online advertisements that offered G's services as a prostitute, and that the clothing she wore in the photographs would be in defendant's residence. G also informed Opitz that in early August 2014, defendant took G to Seattle to work in prostitution, but "she never got any dates" from ads posting her services in the area, nor did she go on any dates in response to online prostitution ads posted in the Portland area.

G informed Opitz that because she did not make money from prostitution, defendant "had the idea for her to work and dance at strip clubs." Defendant selected the strip clubs and transported her to the clubs for auditions and to work as a dancer. Opitz explained, "[G] stated that [defendant] told her he was her 'man' and that she would give the money she made from strip[p]ing to him. [G] said [defendant] would take her shopping and she was allowed to spend her money then."

G further told Opitz that defendant made vaginal, oral, and digital sexual contact with her multiple times per

day at defendant's residence, and that defendant "told her she couldn't tell anyone about them because he could go to prison for a very long time."

G identified defendant's residence from a photograph and informed Opitz that she had stayed there with defendant, and that her possessions, including clothing, were still inside.

Opitz visited defendant's residence and contacted defendant's next-door neighbor. The neighbor "identified her neighbor * * * as a black male named [defendant's first name]. [The neighbor] told me she believes [defendant] is a pimp because he always has females with him." Opitz showed the neighbor a photo of G, and the neighbor recalled G staying with defendant. In addition, the neighbor informed Opitz that she believed that defendant "lives at the residence with an unknown female." Defendant's neighbor later contacted Opitz and informed him that three individuals, among whom the neighbor believed were defendant's aunt and mother, had since entered defendant's residence and then left, carrying two large plastic bags and a laptop computer. The individuals had left the premises before Portland police responded. Finally, Opitz learned that defendant had been arrested in multiple states for prostitution-related crimes.

Based on that information, Opitz concluded that he had probable cause to believe that defendant had committed multiple counts of using a child in display of sexually explicit conduct, ORS 163.670,[3] and that evidence related to those crimes would be found in the residence. A magistrate issued a warrant to seize and examine nine[4] search categories of evidence in defendant's residence, six of which are at issue on appeal:

---

[3] Under ORS 163.670(1), "A person commits the crime of using a child in a display of sexually explicit conduct if the person:

"(a) Employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording; or

"(b) Knowingly records in a visual recording a child participating or engaging in sexually explicit conduct."

[4] The warrant listed thirteen objects. Four of the objects were G's clothing, which we have grouped together into one category.

"- Any photos of [G]

"- Any property belonging to [G]

"*****

"- Any document that identifies the occupants of the above-listed premises (including but not limited to bills, leases, checks, credit cards, identity cards, drivers['] licenses, and correspondence).

"- To search for, seize, and examine any cell phones and their contents for any of the evidence of the items listed in this warrant.

"- Any other evidence of the crime of Using Child in Display of Sexually Explicit Conduct.

"- To search for, seize, and examine any computers and their contents, including computer hard drives, thumb drives, and any other digital evidence storage devices for any evidence of the items listed in this warrant."

Upon executing the warrant, police found clothing that defendant had purchased for G and that she wore in the pictures that he had taken for prostitution advertisements; a note containing a script that defendant gave to G for encouraging clients to purchase private dances; and a book titled "The Art of Seduction," which G had mentioned that defendant encouraged her to read.

Before trial, defendant filed a *pro se* motion to suppress "all evidence, including derivative evidence, oral or otherwise, arising out of the unlawful search of the defendant's residence," on the grounds that the residential search warrant was insufficiently particular. The court denied defendant's motion to suppress.

At trial, the state used evidence found in the search of defendant's residence, including the clothing, the script for encouraging clients to purchase private dances, and the "The Art of Seduction."

C.   *General Legal Framework*

Challenges to search warrant particularity implicate Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution,

areas of law that have been extensively discussed and sum-marized in numerous other cases.[5] Rather than repeating that legal summary and pathway here, we note the follow-ing three legal principles.

First, "[w]hen a search is warranted, a presumption of regularity arises, based on the fact that an independent magistrate has already determined that probable cause exists; therefore, the defendant bears the burden of proving the unlawfulness of a warranted search." *State v. Hargrove*, 327 Or App 437, 443, 536 P3d 612 (2023) (citing *State v. Walker*, 350 Or 540, 553-54, 258 P3d 1228 (2011)). It follows that "we resolve doubtful cases in favor of warrant validity." *State v. Cazee*, 308 Or App 748, 755, 482 P3d 140 (2021) (cit-ing *State v. Van Osdol*, 290 Or App 902, 908, 417 P3d 488 (2018)).

Second, when a search warrant includes a duly incorporated affidavit, then "the contents of the affidavit assist us in determining the scope of the search that the war-rant permitted."[6] *State v. Mansor*, 363 Or 185, 204, 421 P3d 323 (2018)[7]; *see also Cannon*, 299 Or App at 626 (explaining

---

[5] Article I, section 9, provides that "no warrant shall issue but upon prob-able cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Similarly, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Because we ultimately decide the issues under Article I, section 9, we do not address the parties' Fourth Amendment arguments.

[6] We "consider the warrant and affidavit together *** because defendant did not controvert that the affidavit was physically attached to the warrant." *Vesa*, 324 Or App at 680 (citing *State v. Mansor*, 363 Or 185, 203-04, 421 P3d 323 (2018)).

[7] We recognize that *Mansor* and its progeny have identified and developed heightened particularity standards for warrants to search for digitally held information. *See, e.g.*, *Mansor*, 363 Or at 218 (explaining that warrants for digital information "must identify, as specifically as reasonably possible in the circum-stances, the information to be searched for, including, if relevant and available, the time period during which that information was created, accessed, or other-wise used"); *Turay*, 371 Or at 141 (explaining that the "specificity component" of the particularity requirement "gives rise to special requirements in the context of a warrant to search for digital data"). When we cite to the *Mansor* court's artic-ulation of search and seizure principles, we are not transposing the heightened standard for warrants to search for digital data into the context of warrants to search physical places or for physical items. *See* 363 Or at 197-203 (discussing "some of the ways that digital data, whether stored on a computer or other digital device, differs from physical evidence"). We are instead citing the *Mansor* court's

that "we are confined to the facts asserted within the 'four corners' of the affidavit and any reasonable inferences that can be drawn from them"). "We examine the affidavit in a commonsense and realistic fashion, taking into account both facts and inferences[.]" *Cazee*, 308 Or App at 755 (citing *Van Osdol*, 290 Or App at 908).

Third, a search warrant must be sufficiently particular; that is, it "must allow the executing officer to identify with reasonable effort the things to be seized for which a magistrate has found probable cause." *Hargrove*, 327 Or App at 442-43. The "particularity" analysis is informed by "two related, but distinct, concepts," specificity and overbreadth. *Mansor*, 363 Or at 212; *see also Turay*, 371 Or at 141 (explaining that specificity and overbreadth inform the particularity analysis "in any context"). "We have decided fewer cases that address the particularity requirement as it applies to the 'thing to be seized,'" and the Supreme Court has articulated that "[t]he doctrine in that area is highly fact dependent and eludes a single, concrete articulation." *Mansor*, 363 Or at 212. At the core, however, the "purposes of the particularity requirement as to things are the same for the requirement of particularity as to places." *Id.*

Specificity requires that "the search be as precise as the circumstances allow and that undue rummaging be avoided." *State v. Rose*, 264 Or App 95, 107, 330 P3d 680, *rev den*, 356 Or 400 (2014) (internal quotation marks omitted); *see also Mansor*, 363 Or at 212 (explaining that in general, a search warrant "must be sufficiently specific in describing the items to be seized and examined [so] that the officers can, 'with reasonable effort ascertain' those items to a 'reasonable degree of certainty'" (quoting *State v. Blackburn/Barber*, 266 Or 28, 35, 511 P2d 381 (1973))).

In addition, a search warrant must not be overbroad, that is, a search warrant "must not authorize a search that is 'broader than the supporting affidavit supplies probable cause to justify.'" *Mansor*, 363 Or at 212 (quoting *State v. Reid*, 319 Or 65, 71, 872 P2d 416 (1994)); *see also Cannon*,

---

comprehensive discussion of Article I, section 9, case law and the historical circumstances surrounding the legal framework. *Id.* at 205-06.

299 Or App at 626 ("[T]he gravamen of an overbreadth challenge is an asserted lack of probable cause for the invasion of interests in privacy in premises or items." (Internal quotation marks omitted.)). As we recently reiterated in *State v. Goode*, 335 Or App 108, 120, ___ P3d ___ (2024), there must be "a nexus *** between the item[s] to be seized and criminal behavior." (Internal quotation marks omitted.) Probable cause is therefore "examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id.* (internal quotation marks omitted). "'[T]he standard of probability requires the conclusion that it is more likely than not that the objects of the search will be found at the specified location.'" *Cazee*, 308 Or App at 755 (quoting *State v. Williams*, 270 Or App 721, 725, 349 P3d 616 (2015)) (emphasis omitted).

As explained below, we conclude that the residential search warrant constitutes what the Supreme Court has described as a "mixed warrant" because it "combined some search categories that satisfied the constitution's particularity requirement with others that did not." *Turay*, 371 Or at 157. That conclusion then requires us to consider the proper remedy in light of the mixed warrant. As discussed later, we remand to the trial court "for the development of a factual record, and for the trial court to make findings, regarding the standard" articulated by the Supreme Court in *Turay*: "[T]he unlawful search categories establish that all the challenged evidence is presumptively a product of the constitutional violation as to particularity, but *** defendant is not entitled to suppression if the state can prove that the challenged evidence was untainted by that violation." *Id.* at 169-70.

D.   *Analysis of Challenged Search Categories*

Defendant asserts that six search categories in the 2014 residential warrant are not sufficiently particular. We address those six categories in turn, focusing on whether they are sufficiently particular for a physical search of defendant's residence. Although defendant invites us to incorporate aspects of the developing law on specificity for searches of digital devices into the context of searches of physical places, the search of a residence is not analogous to the search of

digital devices, given a digital device's "unprecedented capacity *** to collect and store a diverse and vast array of personal information." *Hargrove*, 327 Or App at 451 (declining the defendant's invitation to apply "the standard for particularity of warrants set forth in *Mansor* for searching digital devices *** to warranted searches of records maintained by third-party companies") (internal quotation marks omitted); *see also Mansor*, 363 Or at 197-203 (discussing "some of the ways that digital data, whether stored on a computer or other digital device, differs from physical evidence").[8]

Thus, we review whether the categories challenged on specificity grounds sufficiently "'describe, with particularity, the place to be searched and the persons or things to be seized.'" *Hargrove*, 327 Or App at 451 (quoting *Rose*, 264 Or App at 106). And we review whether the search categories challenged as overbroad "authorize a search that is 'broader than the supporting affidavit supplies probable cause to justify.'" *Mansor*, 363 Or at 212 (quoting *Reid*, 319 Or at 71). We conclude that four of the challenged categories are insufficiently particular under Article I, section 9.

1. *The search category regarding "[a]ny photos of [G]" is sufficiently particular.*

Defendant argues that the search category authorizing a search for "any photos of [G]" is overbroad because it applies to an "entire categor[y] of evidence without any limitation." We disagree with defendant's argument. Opitz's affidavit set out facts to establish that G was a 15-year-old who went missing from a treatment center, had no lawful reason to be in defendant's residence, and was likely being trafficked by defendant and engaging in sexual acts with him at the residence. Under the circumstances, any photos of G in defendant's residence, explicit or not, would be circumstantial evidence to corroborate G's version of events and connect defendant to criminal behavior. Beyond that, Opitz discussed that through a Google search, he found prostitution advertisements on multiple websites that included

_____

[8] Some of the search categories in the 2014 warrant include the examination of cell phones and computers; but, as explained below, we conclude that those categories are overbroad even without considering the heightened particularity requirements for commands to search a digital device.

photographs of G. Opitz explained that G had confirmed that the photographs were her and informed him that defendant had taken the "sexually explicit photos" for the posts with his cell phone while she was in his residence and had posted the advertisements on the internet.

We have explained that "a warrant can be broad and still sufficiently particular." *State v. Reger*, 277 Or App 81, 91, 372 P3d 26, *rev den*, 359 Or 847 (2016). "A person commits the crime of using a child in a display of sexually explicit conduct" if that person "[e]mploys, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording[.]" ORS 163.670(1)(a). Under the circumstances, where the affidavit purports that defendant took sexually explicit photographs of G, a 15-year-old girl, displayed them online, and was sexually abusing her and trafficking her from the residence for sex, we conclude that a search category authorizing police to search a residence for any photographs of G is not "broader than the supporting affidavit supplies probable cause to justify." *Mansor*, 363 Or at 212 (internal quotation marks omitted).

We further conclude that the search category is sufficiently specific, because "it identified the place to be searched"—defendant's residence—"and the thing to be searched for and seized"—photographs that are evidence of defendant's crimes against G. *Rose*, 264 Or App at 108.

We therefore conclude that the "any photos" search category is sufficiently particular.

2.   *The search category regarding "[a]ny property" of G is sufficiently particular.*

Defendant argues that the search category authorizing a search for "[a]ny property" of G is overbroad because it applies to an "entire categor[y] of evidence without any limitation." We again disagree with that argument. Although an "any property" search category might ordinarily amount to an invitation for police to engage in "'undue rummaging,'" *Reger*, 277 Or App at 91 (quoting *State v. Massey*, 40 Or App 211, 214, 594 P2d 1274, *rev den*, 287 Or 409 (1979)), this warrant concerns a relationship that was unlawful in

all respects. As explained with regard to the search for photos, there was no lawful reason for G to be in defendant's residence or have property there. In the context of their relationship and the purported crimes, finding *any* of G's property in defendant's residence would corroborate G's version of events, connect defendant to criminal behavior in abusing and trafficking her for sex from the residence, and aid in convicting him.[9] We therefore conclude that the "[a]ny property" of G search category is not "broader than the supporting affidavit supplies probable cause to justify." *Mansor*, 363 Or at 212 (internal quotation marks omitted).

   3.  *The search category regarding "[a]ny document that identifies the occupants of the" residence is not sufficiently specific.*

        Defendant argues that the search category authorizing police to search for "[a]ny document that identifies the occupants" of the residence is insufficiently particular and "tantamount to a general warrant." Specifically, defendant contends that the command is so "nonspecific" as to the documents sought—of any nature or size, including as small as a credit card—and so general as to the target (any "occupants")—that it essentially gave police "authority to search everywhere in the house" for new leads. We agree with defendant's argument.

        Even if we assume that documents identifying persons who occupied the residence at the same time as G would bear a proper nexus to defendant's criminal behavior, the search category is so broad that it effectively allows an exploratory search of the residence for additional investigatory leads of other persons and possible crimes. The category is broad enough to include anything from fast-food receipts to bank records, and it includes no timeframes, either in the sense of what constitutes occupancy or at what point that occupancy occurred. Opitz's affidavit asserted that the requested items were "evidence of the nature of relationship between [G] and [defendant]," which could supply

---

[9] Defendant does not challenge the arguably broader search category that is more explicitly tied to G's presence at his residence: "Any document or item that demonstrates [G] was present at the premises or had contact with persons living at the premises."

a timeframe in light of the other parts of the affidavit, but even that would not be sufficient to prevent an executing officer from searching virtually anywhere (from every drawer to clothing pockets) without any guidance as to what documents might sufficiently identify the occupants of the residence and connect them to defendant's crimes.

We therefore conclude that the search category authorizing police to search for any document that identified the occupants of the residence is not sufficiently particular.[10]

4. *The two search categories authorizing police to "search for, seize, and examine" any cell phones, computers and "other digital evidence storage devices" and their contents for any evidence of the items listed in the warrant are unconstitutionally overbroad.*

The two search categories that authorized the search of "any" cell phones and "any" computers or digital storage devices in the residence are unconstitutionally overbroad under *Cannon*, 299 Or App at 618, and *State v. Cantrell*, 327 Or App 548, 536 P3d 606 (2023). "Where a search warrant authorizes the search of multiple electronic devices, the supporting affidavit must supply probable cause 'for each device that a warrant authorizes to be searched.'" *Cantrell*, 327 Or App at 549 (emphasis in original; citing *Cannon*, 299 Or App at 629). It follows that "[a] warrant that is supported by probable cause to search some identified devices, but not all identified devices, is overbroad and invalid." *Cantrell*, 327 Or App at 549 (citing *State v. Friddle*, 281 Or App 130, 142, 381 P3d 979 (2016)).

In this case, the search warrant and supporting affidavit do not establish probable cause for the police to search, seize, and examine "any cell phones," "any computers," and "any other digital evidence storage devices." As in *Cannon* and *Cantrell*, Opitz did not present information

---

[10] To the extent that defendant is seeking to protect the privacy rights of others whose identifying documents might have been in his residence, that argument is irrelevant as to whether *defendant's* personal privacy rights under Article I, section 9, were violated due to the particularity of the search category. *State v. Soto-Navarro*, 309 Or App 218, 225, 482 P3d 150 (2021) (explaining that "under the current case law, a person may not seek suppression of evidence to vindicate someone else's rights").

about why there was probable cause to believe that all the identified devices would contain evidence of use of a child in a display of sexually explicit conduct. Nor could he, because like in *Cannon*, this search category "authorized a search of all of defendant's electronic devices, including devices that [his] affidavit did not indicate that defendant even owned." *Cannon*, 299 Or App at 624.

Nor did Opitz's discussion of his training and experience create "the necessary nexus between the nature of the crime, the evidence sought, and the place to be searched, *i.e.*, all of defendant's electronic devices." *Id.* at 631. While Opitz's statements "may provide a basis for concluding that any single device owned by defendant could possibly contain" evidence of the crime, they do not provide a basis for concluding that every cell phone, computer, and other digital device owned by defendant was more likely than not to contain such evidence. *Id.* Opitz did not explain how his knowledge about cell phones and computers connected to the particular facts of the present case.[11] And Opitz did not explain why he had probable cause to believe that evidence might be found on any devices located in defendant's residence.[12] "The best that can be said * * * is that it is reasonable to think that such devices *might* contain evidence, not that it is *likely* that they would." *Cantrell*, 327 Or App at 556 (citing *Cannon*, 299 Or App at 632-33).

We therefore conclude that the two search categories authorizing police to "search for, seize, and examine" "any cell phones and their contents for any of the evidence of the items listed in this warrant" and "any computers and their contents, including computer hard drives, thumb drives, and any other digital evidence storage devices for any evidence of the items listed in this warrant" are overbroad in violation of Article I, section 9.

---

[11] Opitz explained generally how cell phones store various data and access data on the internet; how cell phone records contain user data and phone companies transport and retain data; how various systems and devices store data; and how police conduct forensic searches of digital devices.

[12] Opitz's statements may have provided a basis to conclude that the cell phone seized incident to defendant's arrest more likely than not contained evidence of use of a child in a display of sexually explicit conduct, but that cell phone was not likely to be found in defendant's residence because it was already in police custody.

5.   *The search category that authorized police to search for "[a]ny other evidence of the crime of Using Child in Display of Sexually Explicit Conduct" is not sufficiently particular.*

We conclude that the search category authorizing a search for "[a]ny other evidence" of the crime of using a child in a display of sexually explicit conduct is not specific enough to prevent "undue rummaging" by executing officers. *Massey*, 40 Or App at 214.

As an initial matter, we reject the state's argument that the challenged category is a permissible restatement of the plain view doctrine. The plain view doctrine applies in the context of seizures and allows officers to "seize an item if the officer can do so from a position where that officer is entitled to be and the incriminating character of the item to be seized is immediately apparent." *State v. Currin*, 258 Or App 715, 718-19, 311 P3d 903 (2013) (internal quotation marks omitted). But we are not confronted with a question of whether officers could seize evidence they had lawfully discovered. Instead, we are evaluating a search category that authorizes officers to search for "[a]ny other evidence" of defendant's alleged crimes.[13]

We conclude that the "[a]ny other evidence" search category is not specific enough to prevent "undue rummaging" by executing officers. *Compare Massey*, 40 Or App at 214, *with Reger*, 277 Or App at 91-92 (where the court concluded that a category was sufficiently particular when the "warrant did not provide police with carte blanche to begin 'rummaging' through [the] defendant's home for anything but *those kinds of evidence* in connection to specific charges" (emphasis added)).[14]

---

[13] *State v. Farrar*, 309 Or 132, 786 P2d 161, *cert den*, 498 US 879 (1990), does not aid the state's argument. The *Mansor* court limited the precedential utility of *Farrar* by recognizing that it relied in large part on *former* ORS 133.585 (1973), *repealed by* Or Laws 1997, ch 313, § 37. 363 Or at 213-14. As the Supreme Court recognized, *Farrar* notwithstanding, "merely identifying the crime under investigation [does not provide] sufficient particularity." *Id.* at 214.

[14] The legal standard established in *Mansor* and its progeny, "that a warrant authorizing a search for all 'evidence of a particular crime' is not sufficiently specific to pass constitutional muster," applies squarely to warrants to search for digital data. *State v. Bock*, 310 Or App 329, 336, 485 P3d 931 (2021) (citing *State v. Savath*, 298 Or App 495, 502, 447 P3d 1, *rev den*, 365 Or 722 (2019), and *Mansor*,

In so concluding, we recognize that "[a] general investigative search of a crime scene \* \* \* differs in nature from a search to seize a specific object, such as stolen property or a drug shipment." *State v. Hodges*, 43 Or App 547, 552, 603 P2d 1205 (1979). We further recognize that "in an investigative search of the scene of a recently committed crime, the police do not know in advance what specific items they seek, but do know that instrumentalities and other evidence of crime probably exist and they know the premises upon which such items will be found." *Id.* However, we also recognize that "[t]he purpose behind the particularity requirement is a prohibition against general warrants whereby administrative officers determine what is and what is not to be seized, to guide the officer to the thing intended to be seized and to minimize the danger of unwarranted invasion of privacy by unauthorized seizures." *Reger*, 277 Or App at 90 (internal quotation marks, brackets, and ellipses omitted). And we recognize that "[t]he 'degree of specificity' required to achieve that objective 'depends on the circumstances and the nature of the property to be seized.'" *Id.* at 91 (quoting *Rose*, 264 Or App at 107).

In the present case, under the search categories that we have concluded are valid and those that defendant does not challenge, police were authorized to search for the following categories of items for evidence of using a child in display of sexually explicit conduct: "photos of the interior and exterior of the residence"; "[a]ny photos of [G]"; enumerated items of clothing that G was wearing in photographs that were posted online; and "[a]ny document or item that demonstrates [G] was present at the premises or had contact with persons living at the premises." The authorization to search for "[a]ny other evidence" of the named crime, in addition to the broad authorization under those search categories, amounts to a general authorization to rummage through defendant's residence. *Compare Massey*, 40 Or App at 214, *with Reger*, 277 Or App at 92 ("Thus, as we concluded in *Rose*, because the warrant limited police to search for particular types of evidence at a particular location in

---

363 Or at 213). We do not foreclose the potential that a similar search category in a warrant to search a physical place or for physical items, under different circumstances, might pass constitutional muster.

connection with a specific set of alleged crimes, it was suffi-
ciently particular.").

We therefore conclude that the "[a]ny other evi-
dence" search category is not sufficiently particular.

6. *Remedy: We reverse for the parties to create a record
under the Turay framework for addressing particu-
larity issues in mixed warrants.*

Having determined that four of the challenged
categories failed to satisfy the constitutional particularity
requirement, we consider the appropriate remedy and apply
the legal framework introduced in *Turay*, 371 Or at 167-69.
Because the state did not have an opportunity to "develop a
factual record on the question whether the challenged evi-
dence was untainted by" the insufficiently particular search
categories, we conclude that "it is appropriate to remand for
the trial court to determine which, if any, of the challenged
evidence must be suppressed under Article I, section 9." *Id.*
at 168-69. As such, we do not reach the parties' arguments
about harmlessness.

The *Turay* court

"held for the first time that *** unlawful search categories
establish that all the challenged evidence is presumptively
a product of the constitutional violation as to particularity,
but that [a] defendant is not entitled to suppression if the
state can prove that the challenged evidence was untainted
by that violation."

*Id.* at 169.

We understand the *Turay* court's articulation of
the analytical framework that Oregon courts should apply
when "an evidentiary dispute involves both a warrant-based
search and unlawful police conduct" to apply equally to
warrants to search physical places for physical items and
to warrants for digital data. *Id.* at 164-65. The *Turay* court
does not limit the remedy to warrants to search for digital
data, nor do we understand the underlying legal principles
to be specific to those types of warrants. To the contrary,
the *Turay* court primarily relied on two cases concerning
searches of physical places and seizures of physical items,

*DeJong* and *Johnson*, in reaching its conclusion. *Id.* at 164-69; *see State v. DeJong*, 368 Or 640, 497 P3d 710 (2021) (concerning a motion to suppress evidence obtained from a warranted search of a residence); *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003) (*Johnson I*) (concerning a motion to suppress clothing and boots that police had seized from the defendant at the police station).

The *Turay* court answered "the extent, if any, to which evidence obtained in a search performed pursuant to a warrant can be considered lawfully obtained when the warrant combined some search categories that satisfied the constitution's particularity requirement with others that did not." 371 Or at 157. The court explained that "to determine the extent to which evidence must be suppressed as the product of a constitutional violation, our case law directs us to consider what actually transpired," which, in the case of a mixed warrant, "ultimately turns on how the search in fact was executed." *Id.* at 163. The court declined to "adopt the 'severance' doctrine," which we had long applied, concluding that in the context of mixed warrants, its "case law does not permit us to presume that the state lawfully obtained any evidence through the search." *Id.* at 163-64.

Thus, for mixed warrants, courts must address two questions: "[1] whether the defendant can 'establish a minimal factual nexus between [a constitutional violation] and the challenged evidence';" and "[2] if so, *** whether the state can 'establish that the challenged evidence was untainted by' the constitutional violation." *Id.* at 164 (quoting *DeJong*, 368 Or at 642). Restated, "when the defendant establishes a minimal factual nexus between a constitutional violation and challenged evidence that was obtained pursuant to a warranted search, there is a presumption that the challenged evidence must be suppressed, but the state has the opportunity to rebut that presumption." *Id.* (citing *Johnson I*, 335 Or at 520).

We therefore reverse for further proceedings because "[n]either party had the opportunity below to address the standard that we have now identified as governing whether the challenged evidence must be suppressed when a warrant contains some search categories that satisfy the

particularity requirement and others that do not," nor was either party "alerted to the need to create a factual record to determine whether, under that standard, the evidence must be suppressed." *Turay*, 371 Or at 169. We remand for development of that record and "for the trial court to determine which, if any, of the challenged evidence must be suppressed under Article I, section 9." *Id.*

Our remand obviates the need to address defendant's second through eighth assignments of error, as well as defendant's third, sixth, or seventh *pro se* assignments of error. Defendant's second and third assignments of error challenge the trial court's denial of his motions to suppress evidence obtained from the 2014 and 2018 cell phone searches. Both of those search warrants incorporated affidavits that relied on evidence obtained from the search of defendant's residence. We express no opinion as to how the trial court will rule after engaging in the *Turay* analysis. We do not address defendant's fourth through sixth assignments of error, which concern his motion for an election and the admissibility of certain evidence, because the record is likely to develop differently on remand. We do not reach defendant's seventh or eighth assignment of error, which concern nonunanimous jury instructions and sentencing, because they are not likely to arise on remand. *See Savage*, 305 Or App at 342. Finally, we do not reach defendant's third *pro se* assignment of error, which raises a *Brady* violation that arose at sentencing, or his sixth and seventh *pro se* assignments of error, which concern jury instructions and sentencing.

## III.    REMAINING *PRO SE* ASSIGNMENTS OF ERROR

We turn to defendant's first, second, fourth, and fifth *pro se* assignments of error, because they will still be at issue when the case is remanded. *See Savage*, 305 Or App at 342. We conclude that the trial court did not err.

A.    *Motion to Suppress Evidence from the First Traffic Stop*

In defendant's first *pro se* assignment of error, we understand him to assert that the trial court erred in denying his motion to suppress evidence resulting from the initial traffic stop that led to his arrest, because the interaction

was marred by multiple state and federal constitutional violations. "We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). "When the trial court did not make express findings and there is evidence from which the trial court could have found a fact in more than one way, we will presume that the trial court decided the facts consistently with the trial court's ultimate conclusion." *Id.* at 166. We conclude that the trial court did not err.[15]

        The record amply reflects that officers had reasonable suspicion to stop defendant. The officers were "able to point to specific and articulable facts that support[ed] [their] belief that [defendant] may have committed or may be about to commit" the crime of using a child in a display of sexually explicit conduct, and their "subjective belief [was] objectively reasonable, given the facts in the record." *Id.* at 186. The record supports that prior to stopping the vehicle that defendant was driving, the police knew the following: (1) G was underage; (2) G had applied for and danced at multiple strip clubs; (3) at one of the clubs, G was accompanied by a male who held her money; (4) G told an employee at a strip club where she was working that she was trying to get away from the male and could not; (5) using a phone number G had used at one of the strip clubs in connection with employment and Googling that number, police had found multiple on-line prostitution ads, some of which used the stage name that G used when working at the strip clubs; and (6) defendant transported G to the parking lot of a strip club just before she understood a dance shift to be starting. Those facts support reasonable suspicion for the investigatory traffic stop.

        In addition, the police had authority to search defendant's vehicle without a warrant as a consent search. The state has shown by the preponderance of the evidence that

_____

[15] Under this assignment of error, we also understand defendant to argue that he did not consent to the police's search of his cell phone on or about the day of his arrest. We conclude that defendant's phone was not searched by police prior to obtaining a search warrant and reject defendant's arguments without further discussion.

someone having the authority to do so gave the officers consent to search defendant's vehicle, and that the consent was given voluntarily. *State v. Bonilla*, 358 Or 475, 489, 366 P3d 331 (2015). Defendant gave an officer permission to move his car into a parking spot, which led to an officer's plain-view observation of some evidence. Soon after, when defendant informed officers that he lacked authority to consent to a search of the vehicle because it was a rental car rented under his mother's name, investigating officers obtained her voluntary consent before the search. We therefore conclude that the trial court did not err.

B.   *Speedy Trial Violation*

        In defendant's second *pro se* assignment of error, we understand him to argue that the trial court erred in denying his motion to dismiss for lack of a speedy trial. "We review a trial court's denial of a defendant's motion to dismiss for lack of a speedy trial for legal error and we are bound by the trial court's findings of fact if they are supported by the record." *State v. Krieger*, 306 Or App 71, 72, 473 P3d 550 (2020), *rev den*, 367 Or 535 (2021) (citing *State v. Johnson*, 342 Or 596, 608, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008) (*Johnson II*)). It follows that "[a] trial court's factual findings 'concerning the length and reasons for the delay, as well as the type, level, and cause of any anxiety that defendant suffered, are binding if supported by evidence.'" *Krieger*, 306 Or App at 72 (quoting *Johnson II*, 342 Or at 608).

        The trial court did not err in concluding that the reasons for the delay were justified and denying defendant's speedy trial motion. The case was complex, both because of the nature and number of charges and because other related charges had previously been tried in a different county. In addition, defendant faced a severe penalty if convicted. Finally, as the trial court found, defendant "more often than not moved for" the continuances and never "timely or meaningfully" objected to others that were granted.[16]

_____

[16] We note that the trial court expressly found that there was no prejudice to defendant from either witness that he was unable to call due to the passage of time, because those witnesses were not alibi witnesses, nor could defendant articulate any specific prejudice to his defense from their absence.

## C.  *Denial of Demurrer*

Under defendant's fourth *pro se* assignment of error, we understand him to argue that the trial court erred in denying his demurrer to the indictment, which he made in response to the state's amendment of the indictment. That amendment added allegations to support "the basis for joinder," or "facts sufficient to establish compliance with the joinder statute," as required by *State v. Poston*, 277 Or App 137, 145, 370 P3d 904 (2016), *adh'd to on recons*, 285 Or App 750, 399 P3d 488, *rev den*, 361 Or 886 (2017). We understand defendant to assert that the amendment was of substance, not form, and to argue that it therefore violated Article VII, section 5, of the Oregon Constitution and the Grand Jury Clause of the Fifth Amendment to the United States Constitution.

"Whether the trial court properly allowed the amendment to the indictment to add the allegations supporting joinder is one of law; we therefore review for legal error." *State v. Haji*, 293 Or App 202, 205, 426 P3d 680 (2018), *aff'd on other grounds,* 366 Or 384, 462 P3d 1240 (2020) *Haji I*) (footnote omitted). Like the Supreme Court concluded in *Haji*, and for the same reasons, we conclude that the trial court did not err in concluding that the amendment was one of form and denying defendant's demurrer. *State v. Haji*, 366 Or 384, 420, 462 P3d 1240 (2020) (*Haji II*) (explaining that "the defect in the indictment was one of form, and the trial court correctly permitted the district attorney to amend the indictment," when "the district attorney added only statutory bases for joinder of multiple crimes, which were consistent with the allegations of facts in the original indictment"); *see also Haji I*, 293 Or App at 206-07 ("The only thing that the amendments did was demonstrate that the charges met the statutory procedural standard for being tried as part of a single case, so as to obviate the need for multiple trials.").

## D.  *Double Jeopardy*

Under defendant's fifth *pro se* assignment of error, we understand him to argue that the trial court erred in denying his motion to dismiss after concluding that there was no double jeopardy issue based on overlap between the

Washington County and Multnomah County charges. "In reviewing a motion to dismiss under ORS 131.515, we examine the trial court's legal conclusions for errors of law, and we defer to its factual findings to the extent that the record supports them."[17] *State v. Wilder*, 305 Or App 618, 619, 471 P3d 798 (2020), *rev den*, 367 Or 535 (2021). We conclude that the trial court did not err. Defendant was prosecuted only for events that occurred in Multnomah County. Although the acts defendant committed in the two counties were similar, the record supports the trial court's determination that they were not part of one "continuous and uninterrupted" criminal episode. The trial court therefore did not commit legal error in denying defendant's motion.

## VI.   CONCLUSION

On defendant's first assignment of error, we conclude that four of the challenged search categories in the residential warrant are insufficiently particular and remand to the trial court to develop a record under the *Turay* framework in light of our conclusions. We conclude that the trial court committed no error on defendant's first, second, fourth, and fifth *pro se* assignments of error. Finally, in light of our disposition, we do not address defendant's second through eighth assignments of error, nor defendant's third, sixth, or seventh *pro se* assignments of error.

Reversed and remanded.

---

[17] ORS 131.515 provides, in relevant part,

"Except as provided in ORS 131.525 and 131.535:

"(1)  No person shall be prosecuted twice for the same offense.

"(2)  No person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution and establish proper venue in a single court."